**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jack JOHNSON, Defendant-Appellant.**

**No. 85–2583.**

United States Court of Appeals,
Seventh Circuit.

Argued April 9, 1986.

Decided Nov. 12, 1986.

---

Gregory N. Freedrksen, DeJong, Poltrock & Giampietro, Chicago, Ill., for defendant-appellant.

Laurie J. Barsella, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD, COFFEY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The appellant, Jack Johnson, appeals from his convictions for one count of making false statements to a bank in violation of 18 U.S.C. § 1014 and one count of interstate transportation of a fraudulently procured security in violation of 18 U.S.C. § 2314. For the reasons which follow, we affirm.

I

In early November 1980, the appellant contacted the Merchandise National Bank of Chicago (the Bank) and indicated that he would like to become one of the Bank's customers. Shortly thereafter, on November 6, 1980, the appellant met with Irmgard Kaak, an officer in the Bank's commercial lending division. The appellant represented to Ms. Kaak that he was the president of Southern Materials, Incorporated (Southern),[1] a coal mining operation. He told Ms. Kaak that he needed a $75,000 loan ·in order to purchase a new piece of mining equipment, a drill crawler, from Tri-State Drilling Company (Tri-State). As collateral for the loan, the appellant indicated his willingness to pledge a Krupp Bucket Wheel Excavator (the excavator)—a piece of mining equipment that Southern owned and that was allegedly valued at more than

---

1. Ms. Kaak testified that Southern's financial statements showed that the appellant and his sister, Jean Johnson (also known as Jean Holi-

$500,000.[2] The appellant also indicated that he would like the Bank to extend him a $200,000 line of credit.

A few days after the appellant's visit, the Bank approved the $75,000 loan for Southern.[3] The term of the loan was set for ninety days; thus, the loan was scheduled for repayment on February 10, 1981. According to Ms. Kaak's testimony, the loan had such a brief maturity date because the appellant told her not only that he intended to resell the drill crawler but also that he already had a willing buyer. The potential purchaser was identified as an individual named D. Harrison Lane.

On November 12, 1980, shortly after the loan was approved, the Bank disbursed the proceeds of the loan by issuing Cashier's Check No. C 174589 payable to Tri-State. Tri-State was a partnership operated by Tomi Sue Goodwin and Jean Holiday, the appellant's sister.[4] Tri-State deposited the cashier's check in its account in Mulberry, Arkansas. Of the $75,000 deposited, $50,000 was withdrawn by check payable to cash and endorsed by Jean Holiday. Southern, which had just purchased the drill, received $20,000 of the proceeds via two wire transfers from Tri-State's account.[5]

According to Ms. Kaak, the appellant later returned to the Bank on February 5, 1981—five days prior to the loan's due date—and said that he had sold the drill crawler to Lane for $100,000. The appellant wanted to open a new account for Southern and to deposit in that account the Lane check as well as three other checks totaling $75,000. The appellant instructed Ms. Kaak to wait until the four checks had cleared and then to debit the new account to repay the $75,000 loan. At that time, the appellant again inquired into the possibility of establishing a $200,000 line of credit.

Ms. Kaak testified that all four of the checks were returned to the Bank because they were drawn on accounts which had insufficient funds to cover them. Therefore, because there were no funds to repay the loan, the Bank explored the possibility of liquidating the pledged collateral. Accordingly, on June 22, 1981, Carl Chevedden, the Bank's assistant vice president in charge of collections, travelled to Marion, Illinois in an attempt to locate the excavator. When he found the excavator, it was disassembled and laying in a field. Mr. Chevedden decided not to take possession of the excavator because he believed that it was nothing more than scrap metal.

As a result of these events, the appellant was charged in a two-count indictment. Count I alleged a violation of 18 U.S.C. § 1014. It charged that, from November 1, 1980 through November 13, 1980, the appellant overvalued property and made false statements to the Bank in an effort to persuade the Bank to give Southern the $75,000 loan. The allegedly false statements were that:

1. Southern Materials, Inc. would use the proceeds of the loan to purchase a piece of equipment called a "drill crawler," drill tech model # 44, from the Tri-State Drilling Company in Fort Smith, Arkansas for $75,000;

day) were the only owners of Southern's stock. Tr. Vol. I at 38.

2. Apparently, Southern Heavy Equipment Company (SHEC) owned the excavator at some time prior to Southern's ownership. Tr. Vol. I at 68. A bill of sale indicates that David Murphy was SHEC's president and Tomi Sue Goodwin was SHEC's secretary/treasurer. Government Exhibit MNB 6. At trial, Ms. Goodwin testified that she and Jean Holiday were joint-venturers in SHEC. Tr. Vol. III–A at 204. Later, David Murphy joined the firm as a partner. *Id.* at 205.

However, the sequence of ownership is not entirely clear. Wallace Brown, a retired assist-

ant director of purchasing for Peabody Coal Company (the excavator's previous owner), testified that Peabody Coal had sold the excavator directly to Southern for $1,833.75. *See* Government Exhibits Peabody 1 and Peabody 2C.

3. In addition to the collateral, the Bank required the appellant to personally guarantee repayment.

4. Tr. Vol. II–A at 92.

5. Government Exhibits Mulberry 3C and Mulberry 3D.

2. An individual named D. Harrison Lane was going to purchase the drill crawler from Southern Materials, Inc. within sixty to ninety days for $100,000;

3. The Krupp Standard Bucket Wheel Excavator, Type 100, Serial # 1172 owned by Southern Materials, Inc. had a value of approximately $750,000.

R.1 at 1–2. Count II alleged a violation of 18 U.S.C. § 2314. It charged the appellant with the interstate transportation of a security (Cashier's Check No. C 174589) which the appellant knew to have been converted and taken by fraud. R.1 at 3.

The appellant was convicted on both counts. With respect to Count I, he was sentenced to two years imprisonment and fined $5,000. With respect to Count II, he was sentenced to five years probation with the condition that he perform 100 hours of community service for each year of probation; he was also fined $10,000. After unsuccessful post-trial motions, this appeal followed.

## II

The appellant raises five issues for our review. First, he contends that Count II of the indictment was fatally defective in that it failed to inform him with sufficient particularity of the charged offense. Second, the appellant contends that the district court erred by admitting Ms. Kaak's testimony concerning the February 1981 bank transactions. The appellant argues that the February testimony was not relevant to Count I since that count charged offenses which were allegedly committed in November 1980. Third, the appellant contends

that the district court erred by admitting non-expert witness testimony regarding the excavator's value. Fourth, the appellant argues that the government suggested unsupported and inadmissible testimony within the hearing of the jury. Finally, the appellant contends that the district court erred by allowing a non-expert witness to testify concerning the genuineness of D. Harrison Lane's signature.

### A. Count II of the Indictment

The appellant first challenges the sufficiency of Count II of the indictment.[6] That count charges the appellant with the interstate transportation of a fraudulently procured security in violation of 28 U.S.C. § 2314.[7] The appellant argues that, although Count II is nominally directed at punishing him for transporting a security, its actual purpose is to punish him for the underlying fraud in the procurement of the security. Assuming this to be the case, the appellant argues that Count II of the indictment is defective because it does not state sufficient facts to support the claim of fraud. The appellant contends that, since he had no idea either how or when the alleged fraud occurred, he was not able to prepare adequately his defense.

The appellant did not object to the indictment's validity prior to trial. Rather, the appellant filed his motion to dismiss Count II after the trial had begun. Tr. Vol. II–A at 51, R.20. The district court denied the motion.

█ Our standard for reviewing an objection to the sufficiency of an indictment is well-settled:

6. Count II of the indictment alleges:
   That on or about November 12, 1980, at Chicago, in the Northern District of Illinois, Eastern Division,
   JACK JOHNSON,
   defendant herein, did with unlawful and fraudulent intent, cause to be transported in interstate commerce from Chicago, Illinois to Mulberry, Arkansas, a certain security of the following tenor and description:
   Merchandise National Bank of Chicago Cashier's [C]heck # C 174589, dated November 13, 1980, payable to Tri-State Drilling Co. in the amount of $75,000.

knowing the same to have been converted and taken by fraud;
In violation of Title 18, United States Code, Section 2314. R.1 at 3.

7. 18 U.S.C. § 2314 provides, in pertinent part:
   Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; ...—
   Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

The validity of an indictment is to be tested by a reading of the indictment as a whole. An indictment is sufficient if it, first, alleges the elements of the offense charged and fairly informs a defendant of the charge against him ... [so that he can prepare a defense] and, second, enables the defendant to plead an acquittal or conviction in bar of future prosecutions.

*United States v. Watkins*, 709 F.2d 475, 478 (7th Cir.1983) (citations omitted). Moreover, "an indictment not challenged before trial will be upheld 'unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted.'" *Id.*

■ 1. *Elements of the Offense.* To support a conviction under section 2314, an indictment must allege: "(1) interstate transportation of a stolen, converted, or fraudulently taken check of at least $5,000 value (2) with fraudulent intent." *United States v. Mosley*, 786 F.2d 1330, 1334 (7th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986). In this case, there is absolutely no doubt that Count II of the indictment charged each of the elements required for a conviction under section 2314. First, the indictment averred that Cashier's Check No. C 174589, a security for purposes of section 2314,[8] was payable in the amount of $75,000—considerably more than the $5,000 requirement. Second, the indictment alleged that the appellant had transported the check from Illinois to Arkansas. Thus, the indictment sufficiently alleged interstate transportation. Finally, the indictment also alleged that the appellant knew that the check was converted and taken by fraud.

■ 2. *Sufficient to be Pleaded as a Bar.* There is no doubt that the indictment was sufficiently definitive as to be pleaded as a bar to future actions. Section 2314 prohibits the interstate transportation of certain goods and securities. In this case, Count II described the improperly trans-

ported security with great particularity. The security was identified as: "Merchandise National Bank of Chicago Cashier's [C]heck # C 174589, dated November 13, 1980, payable to Tri-State Drilling Co. in the amount of $75,000." R.1 at 3. Thus, the district court correctly noted that the indictment described the security with sufficient particularity to protect the appellant from any threat of double jeopardy. Tr. Vol. II–A at 53. Therefore, we need to determine only whether the indictment met the last remaining requirement for testing its validity: whether it sufficiently informed the appellant of the nature of the charge so that he could prepare a defense.

■ 3. *Adequate to Prepare a Defense.* As the Fifth Circuit stated in *Johnson v. United States*, 207 F.2d 314 (5th Cir.1953), *cert. denied*, 347 U.S. 938, 74 S.Ct. 632, 98 L.Ed. 1087 (1954):

The gravemen of the offense prohibited by 18 U.S.C. § 2314 is the transportation in interstate ... commerce of goods with knowledge that they have been secured by the unlawful means referred to in the statute. *It is immaterial whether the accused is guilty of any offense in connection with the primary wrongful taking of the goods, nor is it significant how the accused acquired possession of the goods*, except that this may be shown in order to prove his knowledge of their character as being stolen, converted or taken by fraud.

*Id.* at 319 (emphasis added). This analysis is particularly helpful in our case. Here, the government attempted to prove the underlying fraud only as a means of showing that the appellant *knew* that the security was fraudulently procured. The government was not required to prove the underlying fraud as an element of the offense.

Since proof of fraud is not an essential element for establishing a violation under section 2314, Count II of the indictment was not defective for failing to allege fraud

---

8. For purposes of this statute, a security is defined to include a check. 18 U.S.C. § 2311; *see United States v. Herring*, 602 F.2d 1220, 1222 n.

2 (5th Cir.1979), *cert. denied*, 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 732 (1980).

with specificity. *Mosley*, 786 F.2d at 1334. Count II informed the appellant that his knowledge was in issue. Nothing more was required to enable him to prepare a defense.[9]

Since the indictment informed the appellant that his knowledge was an essential issue in the case, the appellant possessed all of the tools for building his defense. Obviously, the appellant is the best source for information regarding his own knowledge. If, in fact, he was unaware that the security was either converted or fraudulently procured at the time he transported it, he would have known—immediately upon reading the indictment—that he could defend himself by explaining the circumstances through which he acquired the security. More information in the indictment would not have alerted the appellant to other possible defenses.[10]

■ The appellant attempts to support his argument by relying on cases in which fraud is directly charged. This attempted analogy is unpersuasive. In cases of fraud, the deceptive conduct is an essential element of the government's case. If we were to allow the government to indict a defendant by merely alleging fraud—without also alleging the contours of the specific scheme being charged—the defendant would be tremendously disadvantaged.

Unlike fraud, alleged violations under section 2314 focus on: 1) the transportation of a specific security of at least $5,000 value and 2) the defendant's knowledge regarding the *status of that particular security*. *See Mosley*, 786 F.2d at 1334. Thus, if an indictment alleges both of these elements, the defendant's frame of reference has already been defined. He only needs to explore the circumstances surrounding his acquisition and holding of a particular security. Nothing more would be accomplished by requiring the government to include a greater amount of information in the indictment.[11]

## B. The February 1981 Testimony

■ The appellant next argues that the district court erred by allowing the government to introduce evidence concerning the appellant's February 1981 banking transactions. According to the appellant, because Count I alleged an offense which occurred during the early part of November 1980, none of the appellant's February 1981 dealings could be relevant to the charged crime. He submits, therefore, that Ms. Kaak's testimony about the four worthless checks which were returned to the Bank in February, 1981 was unduly prejudicial.

The district court has broad discretion to determine the admissibility of evidence in a

9. As the Fifth Circuit stated in *Johnson v. United States*, 207 F.2d 314 (5th Cir.1953), *cert. denied,* 347 U.S. 938, 74 S.Ct. 632, 98 L.Ed.2d 1087 (1954): "It was not necessary that the indictment allege when the [stolen property] ... was illegally obtained or when it came into the defendant's possession. It is sufficient that it be charged that the defendant knew that it had been so obtained at the time he transported it." *Id.* at 320 (emphasis omitted).

10. If the appellant felt that he needed more information, he could have moved the district court for a bill of particulars under Fed.R. Crim.P. 7(f).

11. Alternatively, even if we were to require that the indictment specifically describe the allegedly fraudulent conduct, we must still read the indictment as a whole to determine whether it is valid. *United States v. Watkins,* 709 F.2d 475, 478 (7th Cir.1983). Therefore, we must read Count I and Count II together and decide whether those two counts adequately inform the appellant of the charged offenses. *Id.* at 479 & n. 4. We conclude that they do. Indictments "'must be read to include facts which are necessarily implied by the allegations made therein.'" *United States v. Gironda,* 758 F.2d 1201, 1209 (7th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985) (quoting *United States v. Anderson,* 532 F.2d 1218, 1222 (9th Cir.), *cert. denied,* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976)). Count I contained the allegedly false statements which the appellant made to the Bank. Those statements suggest that the appellant misrepresented both the value of the collateral and his ability to repay the loan. Count II specifically identified the Cashier's Check—the instrument which represented the proceeds of the loan—as the fraudulently procured security. It is clear that these two counts, when read together, sufficiently apprise the appellant of the fraudulent transaction such that he could prepare a defense. Therefore, the indictment is not "so defective that it does not, by any reasonable construction, charge an offense...." *Watkins,* 709 F.2d at 478.

criminal case. *See United States v. Hattaway*, 740 F.2d 1419, 1424 (7th Cir.), *cert. denied*, 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984). Thus, "we will reverse the district court's evidentiary rulings only upon a clear showing of abuse of discretion." *Id.* In this case, the district court did not abuse its discretion by admitting the testimony concerning the appellant's February 1981 dealings with the Bank. Pursuant to the appellant's objection, the district court held a sidebar conference to consider the admissibility of testimony about the four worthless checks. Upon reviewing the transcript of that conference, however, it is clear that the appellant's only objection was that the testimony had no relevance with respect to Count II. Tr. Vol. I at 111. Contrary to the inference which the appellant has tried to convey in his brief, he never raised an objection concerning Count I.

As we mentioned earlier, as part of its case on Count II, the government presented testimony concerning a scheme to defraud the Bank. This testimony was offered in an effort to show that the appellant *knew* that the cashier's check was fraudulently procured. The appellant objected to testimony of the February 1981 transactions on the ground that it was too remote from the November 1980 allegations. As the appellant's counsel stated:

> Just for the record, your Honor, and I am not sure if we had gotten it on the record or not, but we are objecting to those four checks, but certainly as to the other three $25,000 each checks, we are objecting to on the grounds that that can't be part of any alleged scheme to defraud because it happened long after the loan was made.

*Id.* The district judge tentatively overruled the objection. She conditioned her decision on the outcome of the appellant's previous objection concerning the sufficiency of Count II. On the following day of the trial, the district judge overruled the appellant's objection concerning Count II of the indictment and then confirmed her ruling with respect to the testimony in question:

> Based on that ruling the Court will permit the government to prove the fraud that it is relying on.
>
> \* \* \* \* \* \*
>
> So the government will be free to prove the fraud by which the property was taken, and included in that fraud would be the use of the three checks from the three banks given to the bank, because that legitimately can be viewed as part of the fraud.

Tr. Vol. II–A at 53–54. This decision is reasonable and is not an abuse of discretion.

### C. The Excavator's Value

■ The appellant next argues that the district court erred by admitting non-expert testimony concerning the excavator's value. According to the appellant, neither Mr. Brown, a former employee of Peabody Coal Company, nor Mr. Chevedden, the Bank's collection officer, should have been allowed to offer their opinions regarding the collateral's value.

With respect to the admissibility of lay witness testimony, Fed.R.Evid. 701 provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Neither the testimony of Mr. Brown nor that of Mr. Chevedden runs afoul of this standard. It was not an abuse of discretion for the trial judge to allow their testimony. When read in context, Mr. Brown's testimony first establishes that the excavator was in the same condition in 1985—just prior to trial—as it was in 1977 when he last saw it. Mr. Brown testified that he was formerly employed as an assistant director of purchasing for Peabody Coal Company (Peabody). He stated that, in 1977, Peabody sold the excavator to Southern as scrap metal for $1,833.75. He also

indicated that he had seen the excavator at that time and was aware of its condition. Mr. Brown then testified that he had seen the excavator just prior to trial. He stated that, apart from a change in location and a new coat of paint, the excavator was substantially the same as when he had seen it almost eight years earlier. Mr. Brown's testimony permitted the inference that the excavator's present value should be comparable to its 1977 value. This was clearly permissible testimony.

▮ At the close of Mr. Brown's testimony, the following dialogue occurred between Mr. Brown and the government's attorney:

Q. Sir, based upon your experience in 37 years at the Peabody Coal Company and your familiarity with this equipment, do you have an opinion as to the value of that equipment that you saw on Monday of this week?

A. Yes, sir.

Q. And what is that?

A. Salvage scrap value only in the area of $2000, $2500.

Tr. Vol. III at 67–68. This testimony was relevant in determining the excavator's value, a disputed issue in this case. Additionally, it was "rationally based on the perception of the witness." Mr. Brown had seen the excavator in 1977; he knew that, in 1977, it had sold for approximately $2000; finally, he observed that its condition in 1985 was substantially the same as in 1977. Therefore, we cannot say that the district court erred by allowing this testimony.[12]

▮ Mr. Chevedden's testimony is equally admissible. Mr. Chevedden was the Bank's vice president in charge of collections. He went to Marion, Illinois to take possession of the excavator for the Bank. Apparently, the Bank intended to sell the collateral as a means of repaying South-

ern's $75,000 loan. Mr. Chevedden testified that, although he was able to locate the excavator, he made no effort to take possession of it. The following dialogue then took place:

·Q. Was there any reason why you didn't do that?

\*  \*  \*  \*  \*  \*

A. It was obvious that the equipment was in no wheres worth even a fracrtion [sic] of what the debt was and, that the cost of taking into possession the equipment would be prohibitive in reference to what the equipment was worth. In other words, it was scrap metal.

Tr. Vol. III at 24–25. It is clear that this response was *not* primarily intended to be an opinion of the excavator's value. Rather, the government was asking the witness to explain why he did not take possession of the excavator. As the trial judge explained before allowing the testimony, "It's really a description of what he did and why he did it." *Id.* at 24. This decision was not an abuse of discretion.[13]

### D. Unsupported Government Statements

▮ The appellant contends that the government severely prejudiced his trial by displaying an inaccurate chart and stating unsupported allegations in the presence of the jury. These claims are totally without merit.

First, with respect to the chart, the government's attorney referred to it during his opening statement to show how the proceeds of the $75,000 loan were disbursed. The appellant made no objection to the chart at that time. Later, the government called as a witness Jacqueline Park, a special agent with the Federal Bureau of Investigation. During her testimony, she indicated that the chart was errone-

---

**12.** There is an alternative ground for affirming the district court's decision. The appellant did not adequately preserve an objection to Mr. Brown's testimony. While there was a lengthy sidebar conference, that conference was limited to a discussion of whether Mr. Brown's testimony was relevant to any issue in the case. The appellant never objected to the propriety of Mr.

Brown giving his opinion about the excavator's value. *See* Tr. Vol. III at 52–64.

**13.** Moreover, even if we were to construe this comment as an opinion about the excavator's value, it would meet the requirements of Fed.R. Evid. 701.

ous in one respect. Apparently, the chart contained an ambiguity which indicated that the appellant was a signatory on the Tri-State Drilling accounts. However, Agent Park explained the ambiguity to the jury. Tr. Vol. III–A at 114.

Contrary to the appellant's allegations and citation in his reply brief in this court, Br. at 10, no objection was made to the accuracy of the chart. Rather, the appellant chose to attack the chart on the cross-examination of Agent Park:

Q. Miss Park, the first chart that you showed us, that's not accurate in at least one respect, is that right?

A. That's right.

*Id.* at 120. In view of the appellant's ability to cross-examine on this point, the appellant's failure to object to the chart, the fact that the chart was not admitted into evidence, and the fact that Agent Park explained the chart's ambiguity to the jury, we do not believe that the chart prejudiced the appellant's case.

■ Second, the appellant claims that the government made an unsupported, bad faith factual representation when it asked him, during cross-examination, whether David Murphy was a fictional person. Tr. Vol. IV–A at 163. We disagree. While there was testimony which indicated that David Murphy was a partner in Southern Heavy Equipment Company, there was also testimony that Tomi Sue Goodwin, another partner, had never heard of David Murphy. Tr. Vol. V–A at 71. Therefore, we cannot say that the government's question was asked in bad faith.

■ Finally, the appellant claims that the government made another unsupported, bad faith factual representation when it asked him whether he had ordered Ralph Pyles, an employee, to burn some of Southern's records. We disagree. Mr. Pyles' testimony can be fairly read to support the government's question. *Id.* at 99–100. Therefore, we cannot say that the government's question was asked in bad faith or was totally unsupported.

### E. D. Harrison Lane Signature

■ Finally, the appellant objects to a portion of the testimony given by Susan Shaw, the assistant cashier at First State Bank and Trust in Springfield, Illinois. Ms. Shaw testified that D. Harrison Lane, the drill crawler's putative purchaser, had an account with the bank. She also published to the jury the exact form in which Mr. Lane signed his name. The signature card indicated that Mr. Lane signed as "D.H. Lane." Additionally, after reviewing all of Mr. Lane's checks except the $100,000 check which he wrote to Southern, Ms. Shaw testified that all of the signatures matched Mr. Lane's signature card.

With respect to the $100,000 check, Ms. Shaw testified that the signature read "D. Harrison Lane." The appellant now contends that the district court should not have allowed this testimony. According to the appellant, the jury could have inferred from Ms. Shaw's testimony that the $100,000 check was a forgery since the signature was unlike the ones found on either the signature card or the other checks. Because of this, the appellant contends that Ms. Shaw was actually testifying to the genuineness of the Lane signature. Since Ms. Shaw was not otherwise familiar with Mr. Lane's signature, the appellant argues that her testimony was impermissible under Fed.R.Evid. 901(b)(2).

Ms. Shaw never testified about the signature's genuineness. Rather, she merely published Mr. Lane's signature to the jury. All the checks had been admitted into evidence and she merely said that, on the $100,000 check alone, the word "Harrison" replaced the initial "H." That was entirely permissible.

We find no defect in the indictment and hold that all of the appellant's alleged trial errors are meritless. Accordingly, we affirm the judgment of the district court.

AFFIRMED.