**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Kirk KADEN, Defendant-Appellant.**

No. 85–1787.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 7, 1987.

Decided May 26, 1987.

James A. Graham, Glenn, Seiden & Assoc., Chicago, Ill., for defendant-appellant.

Stephen Heinze, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

On January 29, 1985, a jury found appellant, Kirk Kaden, guilty of conspiring to defraud an insurance company in violation of 18 U.S.C. § 371 and of being an accessory after-the-fact to an offense against the United States in violation of 18 U.S.C. § 3. On April 10, 1985, Mr. Kaden was sentenced to a term of three years in prison followed by five years of probation.

## I

### Facts

At approximately 1:45 a.m., August 10, 1982, a bomb exploded at the Nickel Bag Lounge (Lounge) in Schiller Park, Illinois. The explosion caused a fire that partially destroyed the Lounge. Investigators determined that a pipe bomb had exploded in the middle of a circle of five-gallon glass bottles that had been filled with gasoline.

A part-owner and manager of the Lounge, Thomas Manasses, was later found guilty on charges relating to the explosion and fire at the Lounge. The parties do not dispute Mr. Manasses' guilt. The issue at appellant's trial was whether Mr. Kaden had conspired and participated with Mr. Manasses in setting the explosion and fire at the Lounge.

The government's key witness was Karen Erickson, Mr. Manasses' girlfriend. She testified that Mr. Kaden was a friend of Mr. Manasses and that he visited Mr. Manasses often at both the Lounge and at Mr. Manasses' apartment. Tr. 91–92. Ms. Erickson testified that Mr. Kaden and Mr. Manasses discussed many things, including explosives. She also testified that Mr. Manasses was lazy and was mechanically inept. This testimony was corroborated by Mr. Manasses' roommate, Romaine Gerlecki, who was also a bartender at the Lounge.

On the day of the fire, Mr. Manasses was working as manager at the Lounge. Telephone records show that a call was made from the Lounge to Mr. Kaden's residence at approximately 12:25 p.m. Mr. Kaden arrived at the bar early that afternoon. Telephone records also show that a call

was placed at 12:42 p.m. from the Lounge to Hinckley and Schmitt (the glass bottles used in the fire were made by Hinckley and Schmitt). Ms. Erickson also testified that Mr. Manasses called her that morning and told her to bring the car that she and Mr. Manasses shared to the Lounge because Mr. Kaden needed to use it.

Once at the bar, Mr. Kaden talked with Mr. Manasses for a brief period. Mr. Kaden then left in the car. When he returned, Mr. Kaden parked the car in an alley behind the Lounge. Ms. Erickson ascertained that Mr. Manasses and Mr. Kaden were unloading something from the car into the kitchen of the Lounge. However, because Mr. Manasses had told Ms. Erickson to stay out of the kitchen, she could not see what they were unloading.

The Lounge closed at 7:00 p.m. that evening, the usual closing time for Mondays during the summer. Mr. Manasses told Ms. Erickson to go with Michael Glick, a handyman who worked at the Lounge, to the Plainview Bar. Mr. Manasses said he would meet her later. After Ms. Erickson and Mr. Glick left the Lounge, Mr. Manasses and Ms. Gerlecki went to a restaurant and then went to their apartment. Ms. Gerlecki testified that Mr. Kaden came to the apartment and that he and Mr. Manasses then left together.

According to the testimony of patrons at the Plainview Bar, Mr. Manasses and Mr. Kaden arrived there at approximately 8:30 p.m. The two were loud and boisterous. They purchased a great number of drinks for other patrons and tipped their waitress handsomely. After a few minutes, they left for a brief period and then returned. They remained until about 11:00 p.m., when they left again. They returned at approximately 11:45 p.m. They left the bar a third time at approximately 1:30 a.m., and returned just before 2:00 a.m.

Ms. Erickson, after leaving the Lounge, went to the Plainview Bar but did not wait for Mr. Manasses' arrival. Instead, she went to Mr. Manasses' apartment, where she and Ms. Gerlecki remained for the evening. Shortly after the fire was reported, Mr. Glick called Ms. Gerlecki to inform her

that the Lounge was on fire. Ms. Gerlecki woke Ms. Erickson and the two went to the Lounge (located about one-half block from Mr. Manasses' apartment).

At the scene of the fire, Ms. Erickson was questioned by members of the Schiller Park Police Department. She told them that Mr. Manasses had been with her the entire evening. One of the policemen gave her a ride back to Mr. Manasses' apartment. Ms. Erickson testified that, as she walked toward the apartment, she saw two men in the window of Mr. Manasses' apartment. However, she testified that, when she entered the apartment, she found Mr. Kaden "snoring" on the couch in the living room and Mr. Manasses face down in his bed. She roused Mr. Manasses and the two of them came into the living room where they then found Mr. Kaden awake. Ms. Erickson testified that neither Mr. Manasses nor Mr. Kaden seemed to react to the news of the fire. Shortly thereafter, Ms. Gerlecki returned to the apartment. Both women were very upset. They both testified that the behavior of both Mr. Manasses and Mr. Kaden seemed strange. Ms. Erickson testified that the two men had "silly grins" on their faces and that they would not look out the window at the fire. Tr. at 231. Ms. Gerlecki testified that the two men had "little grins" on their faces and that neither of them could "look you in the eye." Tr. at 110–11.

The next day, as Ms. Erickson was looking through a closet in Mr. Manasses' apartment, she found a can of gun powder and a fuse. She testified that Mr. Manasses was surprised when confronted with this material. She testified that he then went into his bedroom and closed the door. Shortly thereafter, Mr. Kaden arrived at Mr. Manasses' apartment. The two men proceeded into Mr. Manasses' bedroom and closed the door. Ms. Erickson testified that she could hear the two men yelling loudly at one another. Mr. Kaden told Mr. Manasses that he "would take care of it." Mr. Kaden and Ms. Erickson then left the apartment with the gun powder and the fuse. Ms. Erickson testified that they drove around for quite some time and that eventually Mr. Kaden lit the fuse and threw it out the window, and that he dumped the gun powder out of its container as they drove, and later deposited the container in a dumpster. They returned to Mr. Manasses' apartment where Mr. Kaden told Mr. Manasses that he "took care of it." Tr. at 238.

Not long after the fire, Mr. Manasses and Ms. Erickson took a ten-day trip to Daytona Beach, Florida. Shortly after their return, Mr. Manasses gave Ms. Erickson a utility refund check. However, no bank would take the check from her. After that, Mr. Manasses told Ms. Erickson to give the check to Mr. Kaden, "[h]e'll know what to do with it." Tr. at 448. The government argued that the check was Mr. Kaden's remuneration for his participation in the arson. When Ms. Erickson set out on this errand, she was stopped by the police for a traffic violation. She never delivered the check to Mr. Kaden.

At the end of 1982, Ms. Erickson's relationship with Mr. Manasses deteriorated. She began cooperating with the authorities in their investigation of the fire at the Lounge. As part of this cooperation, she taped conversations that she had with Mr. Manasses on January 3, 4, 7, and 10, 1983. Ms. Erickson testified that she chose her own words, and that the government did not tell her what to say.

On April 3, 1983, Mr. Manasses was indicted for participation in the arson. He pled guilty to the offense charged. Mr. Kaden was indicted on September 21, 1984. As noted earlier, he was convicted of conspiring to defraud an insurance company and of being an accessory after-the-fact. From these convictions Mr. Kaden appeals.

## II

### Discussion

#### A. *Jurisdiction*

The government first argues that the trial court abused its discretion in granting Mr. Kaden's motion to extend the time in which to file a notice of appeal. It argues that no adequate showing of excusable neglect was made, as required by Fed.R.

App.P. 4(b). Mr. Kaden was sentenced on April 10, 1985. On May 3, 1985, appellant filed a notice of appeal. On May 30, this court remanded the case to the district court, stating:

> A preliminary review of the short record indicates that this Court is without jurisdiction over this appeal because the notice of appeal was not timely filed; a judgment of conviction was entered, and sentence imposed, on April 10, 1985, but defendant's notice of appeal—prepared *pro se* after he was apparently abandoned by his trial counsel—was not filed until May 3, 1985, two weeks later than the 10–day period prescribed by Fed.R.App.P. 4(b).
>
> This Court cannot enlarge the time for appeal, but the district court can upon a showing of excusable neglect, Fed.R. App.P. 4(b), and it appears that the defendant-appellant may fit within this category. Accordingly,
>
> IT IS ORDERED that the case is remanded to the district court for a determination of whether to extend the time for filing an appeal under Rule 4(b). Defendant's trial counsel is admonished that trial counsel on a criminal case must continue to represent a client wanting to appeal until specifically relieved of that responsibility by this Court, not the district court, upon a motion to withdraw for good cause. *See* Circuit Rule 2(c).

*United States v. Kaden*, No. 85–1787, order at 1 (7th Cir. May 30, 1985).

On June 12, 1985, Mr. Kaden filed a motion to extend the time for filing a notice of appeal. The district court granted the motion on June 14. The court extended the time in which Mr. Kaden was able to file a notice of appeal until May 3, 1985 (the day on which he had filed the late notice of appeal).

■ Rule 4(b) of the Federal Rules of Appellate Procedure provides, in pertinent part:

> In a criminal case the notice of appeal by a defendant shall be filed in the district court within ten days after the entry of the judgment or order appealed from.
>
> \* \* \* \* \* \*
>
> Upon a showing of excusable neglect the district court may, before or after the time has expired, with or without motion and notice, extend the time for filing a notice of appeal for a period of time not to exceed 30 days from the expiration of the time otherwise prescribed by this subdivision.

As noted above, appellant did not file a notice of appeal within ten days of the entry of judgment against him. The district court granted the appellant an extension of thirteen days. We must consider whether the district court abused its discretion in granting appellant's motion to extend the time in which to file a notice of appeal.

As the government indicates, the transcript of the sentencing hearing shows that the trial court informed Mr. Kaden's counsel that a notice of appeal should be filed within ten days of the entry of judgment. Furthermore, the transcript of the hearing on the motion to extend time shows that his counsel offered no other reason than that he confused the federal rules with the state rules of appellate procedure, an excuse which arguably does not rise to the level of excusable neglect. However, as noted by our order of May 30, 1985, it appears that appellant's trial counsel may have "abandoned" Mr. Kaden after his trial. This is evidenced by the fact that Mr. Kaden filed his notice of appeal *pro se*. Based upon these facts, we are unwilling to hold that the trial court abused its discretion in granting appellant's motion to extend. *See United States v. Roberts*, 749 F.2d 404, 408–09 (7th Cir.1984), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1770, 84 L.Ed.2d 830 (1985). In *Roberts*, we stated:

> ... the rules governing notice are mandatory, so that this court will not take jurisdiction where they have not been substantially complied with. Where there is no good reason for allowing an appellant the extension of time he neglected to ask for below, the court will not allow such an extension.
>
> On the other hand, we cannot, especially when dealing with prisoners filing on their own behalf, read the details of compliance inflexibly. Where there is

good reason for allowing an extension, and the notice has been filed within the forty-day outer limit, we are not obliged to insist upon perfect compliance.

749 F.2d at 408; *see also United States v. Ford*, 627 F.2d 807, 811 (7th Cir.) ("Pursuant to Rule 4(b), in a case such as this, in which 'a document is filed within the 40–day period which represents a clear assertion of an intent to appeal, courts have the power to overlook irregularities where fairness and justice so require. *United States v. Hoye*, 548 F.2d 1271, 1273 (6th Cir. 1977).' "), *cert. denied*, 449 U.S. 923, 101 S.Ct. 324, 66 L.Ed.2d 151 (1980).

This case is very similar to *Roberts* in several respects: Mr. Kaden is a prisoner who filed his notice of appeal on his own behalf; he filed that notice within the "forty-day outer limit" of Rule 4(b) (although after the original ten-day period had passed); and he did not ask for the thirty-day extension. Unlike the appellant in *Roberts* (or the appellant in *Ford*), Mr. Kaden apparently made no attempt to contact either the district court or the clerk of the district court during the initial ten-day period. *See Roberts*, 749 F.2d at 408; *Ford*, 627 F.2d at 809. However, it seems that Mr. Kaden was relying upon counsel to file the notice of appeal and only later attempted to file on his own.

The order of this court remanding the case to the district court suggested that this case might be an appropriate one for finding excusable neglect. That order was issued after the forty-day period had already expired and therefore, Mr. Kaden was not informed of the tardiness of his filing until it was arguably too late for him to file a motion to extend the time allowed. "Under the narrow circumstances of this case," *Roberts*, 749 F.2d at 409, we find good reason for the district court's grant of the request for an extension of time in which to file a notice of appeal. Accordingly, we hold that the district court did not abuse its discretion.

B. *Admissibility of Tape Recordings*

1. Reliability

Mr. Kaden argues that the trial court erred in admitting statements made by Mr. Manasses during the taped conversations with Ms. Erickson because the government did not meet the burden, placed upon it by the trial court, of showing that Mr. Manasses was not inebriated to the point of rendering his statements unreliable. The district court held a hearing regarding the admissibility of the tape recordings. After hearing from both the defense and the prosecution, the court stated:

I am going to allow the defendant a voir dire of her [Ms. Erickson] as to how much drinking was going on. As I read that tape there was some question in my mind as to how coherent it is, and there is an unavailability problem. I want to hear some testimony from her as to how sober the parties to that conversation were.

Tr. of Jan. 17, 1985 at 23. After counsel for the government requested a more definitive ruling, the district court responded:

Well, I'm going to give you a ruling that you may not feel is completely satisfactory to you. I'm going to rule that the tapes are admissible unless I find as a result of a voir dire or other evidence that they are unreliable because the parties were so intoxicated at the time that the jury should not be allowed to hear it.

*Id.* at 24.

At trial, the government called Ms. Erickson as a witness. When the government sought to introduce the tape recordings into evidence, the court allowed the voir dire of Ms. Erickson. On direct examination, Ms. Erickson testified that neither she nor Mr. Manasses had more than a "few" (or a "couple") drinks during any of the recorded conversations. She also testified that she knew Mr. Manasses very well, and that she would have known if he had been intoxicated. Finally, she stated that Mr. Manasses was not intoxicated during any of the taped conversations. On cross-examination, Ms. Erickson testified that Mr. Manasses might have had a drinking problem "[o]nce in a while." Tr. at 252. She also testified that she had no knowledge of Mr. Manasses' drinking prior to their taped

conversations. Finally, she stated that Mr. Manasses might be able to consume from fifteen to twenty drinks without showing signs of intoxication. On redirect examination, Ms. Erickson stated that she had not seen Mr. Manasses consume anywhere near fifteen to twenty drinks during any of their meetings. After the voir dire, the court received the tape recordings into evidence.

■ In addressing appellant's contention, it must be noted that a reviewing court gives special deference to the evidentiary rulings of the trial court. We shall only overrule such rulings on a showing that the trial court has abused its discretion. *United States v. Johnson*, 805 F.2d 753, 759–60 (7th Cir.1986). The government presented testimony from a witness who knew Mr. Manasses well and who stated that Mr. Manasses was not intoxicated during any of the taped conversations. Apparently, the defense relied only on the possibility that Mr. Manasses *could have* become intoxicated prior to meeting Ms.

Erickson to argue that the tape recordings should have been excluded. No evidence was presented to show that Mr. Manasses was actually intoxicated during any of the conversations. Given the evidence before the trial court, we can hardly say that the admission of the tape recordings into evidence was an abuse of discretion. *See Johnson*, 805 F.2d at 759–60.[1]

### 2. Rule 801(d)(2)(E) Requirements

Mr. Kaden also argues that the trial court erred in admitting the statements under Fed.R.Evid. 801(d)(2)(E), because the government failed to prove that: 1) a conspiracy existed; 2) Mr. Manasses and Mr. Kaden were members of that conspiracy; and 3) the statements were made during, and in furtherance of the conspiracy as required by Rule 801(d)(2)(E). As we stated in *United States v. Boucher*, 796 F.2d 972 (7th Cir.1986):

Fed.R.Evid. 801(d)(2)(E) provides that a statement is not excludable as hearsay if it is made by a co-conspirator during the

---

1. Appellant's submission on this point is presented in broad-brush form. He may be arguing that, even though Mr. Manasses' statements are those of a co-conspirator, *see* Fed.R. Evid. 801(d)(2)(E), additional "indicia of reliability" are necessary before they can be admitted. *See Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980). This court has firmly rejected that position. *United States v. Williams*, 737 F.2d 594, 610 (7th Cir. 1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *United States v. Xheka*, 704 F.2d 974, 987 n. 7 (7th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *United States v. Papia*, 560 F.2d 827, 836 n. 3 (7th Cir.1977); *see Sanson v. United States*, 467 U.S. 1264, 1265, 104 S.Ct. 3559, 82 L.Ed.2d 861 (1984) (White, J., dissenting from denial of petition for writ of certiorari). In any event, in our view, the testimony of Ms. Erickson, supported by the consistent testimony of Ms. Gerlecki, provides such additional evidence of reliability if it is required.

Mr. Kaden's claim that the tape recordings are unreliable could also be characterized as a challenge to the competency of that evidence. In *United States v. Santiago*, 582 F.2d 1128 (7th Cir.1978), we recognized that a trial judge must make a competency determination when faced with a co-conspirator's statement:

When a statement of a co-conspirator which would otherwise have been regarded as hearsay is proffered, a preliminary question arises under Rule 104 of the Federal Rules of Evidence. Both parties agree and so does this

court that Rule 104 requires a preliminary determination by the trial judge as to the admissibility of the declaration of a co-conspirator. Under Rule 104 the competence of a co-conspirator declaration justifying its admissibility depends upon whether or not the existence of the conspiracy has been sufficiently established, and whether under Rule 801(d)(2)(E) the declaration was made during the course and in furtherance of the conspiracy.

*Id.* at 1130–31 (footnote omitted). As noted in the text, *infra*, the trial court found that the requirements of Rule 801(d)(2)(E) had been met. To the extent Mr. Kaden argues that the evidence is incompetent because of other factors, i.e. frequent substance abuse, it must similarly fail. As this court has noted before, such information goes to credibility rather than competence. *See United States v. Harris*, 542 F.2d 1283, 1302–03 (7th Cir.1976), *cert. denied*, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977). While the court did not have the opportunity to observe Mr. Manasses during the conversations in question, the district judge held a hearing to determine whether the tape recordings were unreliable because of Mr. Manasses' intoxication. His finding that the tape recordings were not unreliable was not clearly erroneous. The government presented ample testimony from both Ms. Erickson and Ms. Gerlecki to support such a finding.

course of and in furtherance of the conspiracy. This court has held that, in order to meet the requirements of the rule, the government must prove, by a preponderance of independent evidence, which is not hearsay, that the conspiracy existed, that the defendant and the declarant were members of that conspiracy and that the offered statement was made during the course of and in furtherance of the conspiracy. *United States v. Santiago*, 582 F.2d 1128, 1135 (7th Cir.1978) *Id.* at 974 (citations omitted). We will reverse the district court's findings with respect to these requirements only if they are clearly erroneous. *United States v. Williams*, 737 F.2d 594, 609 (7th Cir.1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

Prior to trial, the government moved for a ruling on the admissibility of the tape recordings. On January 17, 1985, the government made a detailed offer of proof regarding the admissibility of the tape recordings. The government's offer was based in part on the following facts: Mr. Manasses had previously pled guilty to charges that he had started the fire; Mr. Manasses and Mr. Kaden were good friends who saw each other regularly and who were seen together both immediately before and immediately after the explosion occurred; Mr. Manasses had placed calls to Mr. Kaden and to Hinckley and Schmitt on the afternoon before the fire; Mr. Kaden arrived at the Lounge not long after these calls were placed and used a car shared by Mr. Manasses and Ms. Erickson to pick up something (thought to be the Hinckley and Schmitt bottles) that Mr. Kaden and Mr. Manasses later unloaded at the Lounge; both Mr. Manasses and Mr. Kaden behaved strangely, seeming disinterested, when informed about the fire; Ms. Erickson discovered a can of gunpowder and a fuse in Mr. Manasses' closet the day after the fire (items about which Mr. Manasses claimed to have no knowledge); after assuring Mr. Manasses that he would "take care of it," Mr. Kaden and Ms. Erickson disposed of

the fuse and gunpowder; Mr. Manasses was mechanically inept; and Mr. Manasses sought to have Ms. Erickson deliver a utility refund check (the government argues as payment for services) to Mr. Kaden.

Based upon this offer of proof, the trial court decided to admit the tape recordings into evidence subject to a motion to strike if the government failed to sufficiently prove those facts stated in the offer of proof. Tr. of Jan. 17, 1985 at 24–25.[2] This court has noted previously that a district court may receive co-conspirator statements into evidence in this manner. *See United States v. Andrus*, 775 F.2d 825, 837 (7th Cir.1985). Shortly before resting, the defense moved to strike the tape recordings evidence. Tr. at 527. After hearing from both parties, the court denied the motion. It held that the government had met its burden to link up the tape recordings with the other evidence establishing a conspiracy and Mr. Kaden's involvement with that conspiracy. *Id.* at 536–37.

■ Given the amount of independent evidence offered by the government to establish the existence of the conspiracy and Mr. Kaden's participation in it, the district court's finding that the government had met the requirements of Rule 801(d)(2)(E) was certainly not clearly erroneous. The fact that much of this evidence was circumstantial is beside the point. *See United States v. Dalzotto*, 603 F.2d 642, 645 (7th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979). Moreover, the fact that Mr. Kaden's companion for the entire evening of August 9 and the morning of August 10, 1982 (the date of the fire) was Thomas Manasses—the man who pled guilty to charges of starting the fire— strongly supports the inference that a conspiracy existed and that Mr. Kaden participated in that conspiracy. As this court stated in *Dalzotto*, "[a]lthough presence is insufficient to sustain conviction for conspiracy, it may nonetheless make participation in the conspiracy, or in this case the

---

**2.** The court also conditioned the admission on the possibility that the defense could establish the unreliability of the statements through a voir dire. We need not repeat our discussion of that condition here.

very existence of the conspiracy, 'more likely than not.'" 603 F.2d at 645.

Likewise it is of no benefit to Mr. Kaden that the tape recorded conversations took place after the fire. This court has previously noted that in an arson conspiracy such as this, the true aim of the conspiracy is not simply to destroy a building, but rather to obtain insurance proceeds. *United States v. Xheka*, 704 F.2d 974, 985–86 (7th Cir.) ("The conspiracy continues until defendants obtain the insurance money or abandon their quest."), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). At the time the conversations were recorded, no claim had been filed with the Lounge's insurer and no money had been received. Therefore, the statements were made during the course of the conspiracy. *See id.*

Finally, the finding that the tape recorded statements were made in furtherance of the conspiracy was not clearly erroneous. The conversations clearly demonstrate Mr. Manasses' attempt to conceal the fact that he was involved in starting the fire. They also show that his purpose in trying to conceal this information was to ensure that the insurance claim, made by the Lounge's owners, would be paid. Again, because the "goal" of this conspiracy was to receive the insurance proceeds, Mr. Manasses' statements were made in furtherance of the conspiracy. *See id.*

### Conclusion

Accordingly, the judgment of the district court is affirmed.

AFFIRMED.