**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kojo SABABU, Jaime Delgado, and Dora Garcia, Defendants–Appellants.**

Nos. 88–1450, 88–1434 and 88–1476.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1989.

Decided Dec. 21, 1989.

Anton R. Valukas, U.S. Atty., Joan G. Fickinger and James R. Ferguson, Asst. U.S. Attys., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Jeffrey A. Haas, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for Kojo Sababu.

Jan Susler, Chicago, Ill., for Jaime Delgado.

Carol A. Brook, Federal Defender Program, Chicago, Ill., for Dora Garcia.

Before CUMMINGS, CUDAHY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

The July 1987 Grand Jury returned an eight count superceding indictment against Oscar Lopez, Kojo Sababu,[1] Jaime Delgado, Claude Marks, Donna Jean Willmott, and Dora Garcia.[2] Count 1 of the indictment alleged that the defendants participated in a multi-goal conspiracy to effect the escape of several inmates from Leavenworth federal penitentiary, to transport weapons and explosives with intent to kill and injure people, and to use explosives to destroy government buildings and property. Counts 2–8 alleged Travel Act violations under 18 U.S.C. § 1952. Specifically, Counts 2 and 3 alleged that Delgado, aided by Lopez, travelled from Chicago to Dallas, and back, to promote arson under the laws of Kansas. Counts 4, 5, and 8 alleged that Garcia, aided by Lopez, travelled from Chicago to Leavenworth, Kansas, and back, to promote arson under the laws of Kansas. Counts 6 and 7 alleged that Lopez and Garcia used a telephone to communicate between Chicago and Leavenworth to promote arson under the laws of Kansas.

After a ten week trial, a jury convicted Lopez, Sababu, Delgado and Garcia on the Count 1 conspiracy charge. The jury also returned guilty verdicts on Counts 2, 3, 7 and 8, but acquitted on the remaining counts. Delgado was sentenced to serve a four year sentence to be followed by five years of probation. Garcia was sentenced to a three year sentence and five years of probation. Sababu received a five-year sentence to run consecutively to the prison sentence he was already serving. Lopez received a fifteen-year sentence, also to run consecutively to the prison sentence he was already serving. The defendants raise numerous claims on appeal. We affirm on all counts.

## I. Background

The convictions in this case arise from a broad, multi-goal conspiracy to effect the escape of several inmates from the Leavenworth federal penitentiary; to transport explosives with the intent to kill and injure people; and to use explosives to destroy government buildings and property. Due to the nature of the defendants' claims on appeal, it is necessary to trace the development of the conspiracy in considerable detail. The conspiracy lasted more than two years and included overt acts committed in Kansas, Texas, Louisiana, California and Illinois. At the heart of the conspiracy were defendants Lopez and Sababu, two inmates at the Leavenworth penitentiary, and Chicago defendants Jaime Delgado and Dora Garcia, who conspired with Lopez and Sababu from outside the prison. The conspirators also included California defendants Claude Marks and Donna Jean Willmott, who fled before trial and as of the time of the trial were still at large. In proving the conspiracy at trial, the government relied on audio and video-taped recordings of the defendants, documents written by the defendants, the testimony of several federal agents and officials, and the testimony of two cooperating Leavenworth inmates, George Lebosky and Richard Cobb.

The origins of the conspiracy can be traced to mid–1983, when Lopez, Sababu, David Bryant, and Richard Cobb, all inmates at Leavenworth, began discussing their political philosophies. In those conversations, Lopez boasted that he was the Chicago leader of the FALN,[3] an armed,

---

1. Sababu was indicted under the name Grailing Brown but has appealed under his African name, Kojo Sababu, and will be referred to as such.

2. Dora Garcia was indicted under the name Dora Garcia–Lopez. Prior to trial she submitted a notice of name change indicating that after her divorce from Jose Lopez she had legally changed her name back to her maiden name, Dora Garcia.

3. Fuerzas Armadas de Liberacion Nacional Puertorriquena (Armed Forces of Puerto Rican National Liberation).

clandestine terrorist group dedicated to the violent overthrow of United States rule over Puerto Rico. Lopez told the others that he believed the only way he could win independence for Puerto Rico was by engaging in violent acts against private businesses and against United States government installations. Lopez explained that "his people" lived in Chicago and that he communicated with them through visits, mail and coded telephone calls.

During these conversations, Lopez urged the inmates to begin their own campaign of "armed struggle." All four men discussed the kind of weaponry they would need for their struggle, agreeing that the list should include assault rifles, explosives, remote control devices, plastic explosives, grenades, and a LAW rocket.[4] The flaw in the plan, the inmates realized, was the difficulty of conducting an armed struggle while still imprisoned at Leavenworth. By the summer of 1984, their plan for an "armed struggle" was focused on the more immediate need to formulate a plan of escape from the penitentiary.

Thereafter, Sababu and Cobb discussed the possibility of escape many times. During one of these conversations, Cobb told Sababu that he had heard from another inmate that a helicopter could enter Leavenworth and pick up prisoners without any of the participants being harmed. Sababu presented this plan to Lopez because Sababu believed that Lopez had the organization of people to carry out a helicopter escape. Later, Sababu reported back to Cobb that Lopez liked the idea and agreed to present it to "his people" to get their reaction.

Several weeks later, Lopez told Cobb that the FALN had given him permission to participate in the escape plan. Lopez said the FALN would provide a helicopter, pilot, and some of the materials that would be needed for the escape. Since Cobb was due to leave Leavenworth on parole in the near future, he agreed to provide the FALN with inside information concerning the guards and possible landing sites.

From late 1984 to mid–1985, Lopez, Sababu, Cobb, and occasionally Bryant, met on a daily basis to work out the details of their escape plan. In its final form, the plan called for a helicopter to be flown into the Leavenworth prison yard and land on top of the Education Building. Guards would be held off with gunfire. Helicopters at nearby Fort Leavenworth were to be disabled by Cobb, using explosive devices set by timers. In planning the escape, Lopez, Sababu, and Cobb had consulted an aerial photograph of Leavenworth, an enlarged Federal Reserve map, a surveyor's map, and a Coroner's inquest containing information describing a similar helicopter escape attempt at Marion Penitentiary.

Once out of the prison, the escapees planned to obtain cars in Missouri and then travel to a safehouse located in Des Moines, Iowa, where they would then accumulate funds through robbery or counterfeiting. With that funding, the conspirators intended to buy various explosives and firearms to blow up buildings and kill people. Lopez promised to bring FALN members to help train the men in their "armed struggle."

In September, 1984, Lopez revealed the plan to George Lebosky, another inmate at Leavenworth. Lebosky told Lopez that he knew of a Houston lawyer who had a weapons contact in Louisiana. In reality, Lebosky did not know a Houston lawyer or Louisiana weapons dealer, but he said he did to impress Lopez. Lopez then told Lebosky that he had an escape plan, but added that he had to delay it for another ten months because a certain inmate at Leavenworth would not be released until that time.

Several months after the escape plan was formulated, Lopez learned that a leading figure in the "armed struggle" outside the prison had been arrested. Because of the arrest, Lopez was uncertain whether the FALN would be able to provide weap-

---

4. A "Light–Anti–Tank Weapon"—a shoulder-mounted rocket with an armor piercing war- head.

ons and explosives. Accordingly, Sababu agreed to approach Lebosky and ask him if he could get weapons and explosives from his alleged source in Houston. In December, 1984, Sababu visited Lebosky's cell and told him that Lopez wanted to know whether Lebosky's weapons dealer was still in place. To avoid being caught in his lie, Lebosky said he would call and find out. Although Lebosky never placed that call, he told Sababu several days later that he had learned that the weapons dealer was still available. Sababu said he would let Lopez know.

Several weeks later, Sababu again approached Lebosky, this time with a list of weapons and said, "This is a list of things that me and the other guys will need to make a beat." The list included fragmentation grenades, smoke grenades, phosphorous grenades, eight M16 (automatic) rifles, two silencers, 50 pounds of plastic C–4 explosives, eight bulletproof vests, ten blasting caps to use with the plastic explosives, and 100 30–shot clips for use with the automatic weapons. Sababu told Lebosky that if he could not get the M16s, he should get AR15s, (semi-automatic rifles), which they would then convert to fully automatic weapons. Sababu told Lebosky that the smoke grenades were to be used in the prison yard to obstruct the guards' vision, and the fragmentation grenades were to be used to throw against the guard tower.

Sababu gave the list to Lebosky and told him to get in touch with the attorney in Houston to find out the cost and availability of the weapons. To maintain his credibility with Sababu, Lebosky later told him that the "weapons dealer" said the cost would total $17,600. Sababu relayed this information to Lopez, telling him, "I got a price for the weapons." Lopez said he was pleased with the price, and that he would get in touch with his people in Chicago to make arrangements for payment.

The following day, Sababu stopped by Lebosky's cell to ask him whether the weapons could be picked up and paid for later. Lebosky later told Sababu that he had called the Houston attorney (although he really had not) and that the attorney said the weapons would have to be paid for when they were picked up. Lopez told Sababu and Lebosky that the FALN could not get the money together at that time to pay for the weapons.

That evening, Lebosky asked Sababu whether Cobb was involved in the escape plan. Sababu said that he was, adding that Cobb had volunteered to return to Leavenworth after his release with a helicopter to help Lopez and Sababu escape. Lebosky claimed to Sababu that he had access to as much as $20,000. Sababu told Lebosky that in return for the money, he could join the escape.

On or about February 9, 1985, Lopez told Lebosky that he was going to have his own attorney arrange the pickup of the weapons. Because he was expecting a visit from his attorney on the 18th, he told Lebosky to give him the phone number of the Houston attorney by that date. Lopez also told Lebosky that Cobb was going to act as the middleman once he was out of prison. He explained that Cobb and Cobb's brother were going to blow up the helicopters at Fort Leavenworth so the helicopters could not come after them during the escape.

Faced with the February 18 deadline for coming up with a weapons contact, Lebosky decided to enlist the aid of the prison authorities. He met with a correctional supervisor and told him that several inmates were planning a prison break. After conferring with the FBI, prison officials decided to give Lebosky an FBI telephone number which would be manned by an FBI undercover agent posing as Lebosky's weapons dealer. It was understood that Lebosky would pretend to fund the purchase of the weapons. The only specific direction given to Lebosky was that the undercover agent's telephone number was to be given to Lopez.

Lopez received a prison visit from his Chicago attorney the following day. After the visit, Lopez told Lebosky that his lawyer would make arrangements to call the weapons dealer on March 2. After pretending to call his contact, Lebosky gave Lopez the undercover agent's telephone

number and the name "Roger." That evening, Lopez assured Lebosky that he had passed on the dealer's telephone number and that arrangements to get in touch with him would be made.

On March 2, 1985, Roger Rubrecht, the FBI undercover agent assigned to play the role of the weapons dealer, received a call from an unidentified male who used the agreed-upon code phrase. Rubrecht and the caller agreed to meet at the Dallas Airport on March 23, 1985 and that Rubrecht would be paid $1,000 for his travelling expenses. It was also agreed that the caller would identify himself by wearing a navy blue tie and a light blue handkerchief, and that Rubrecht would identify himself by fanning himself with a copy of Time magazine.

On March 3, Lopez telephoned his sister-in-law, defendant Dora Garcia. Garcia said she was coming to visit on March 23 and Lopez replied, "Then we'll have to make some arrangements." On March 9, Lopez informed Lebosky that "his people" had been in touch with the weapons dealer and that he would learn more on a March 23 visit.

On Saturday, March 23, 1985, defendant Jaime Delgado, wearing the agreed-upon blue tie and handkerchief, travelled from Chicago to the Dallas airport to meet Rubrecht, who was posing as the weapons dealer. Delgado identified himself as "Ray," and Rubrecht identified himself as "Moe". As agreed in the March 2 call, Delgado paid Rubrecht $1,000.

The men discussed the purchase of weapons including M–16s, grenades, C–4 explosives, bulletproof vests, magazines, dynamite, AR15s and a LAW rocket. Rubrecht gave Delgado photographs of some of the weapons. After examining the LAW rocket manual, Delgado described the LAW rocket as "extremely attractive." Also expressing an interest in buying guns, Delgado asked for eight of them—the exact number that Sababu told Lebosky they would need for the escape.

At the end of the meeting, Delgado told Rubrecht that "they" would buy the C–4 explosives "for sure." Rubrecht said that he expected to be paid in cash. Delgado assured Rubrecht that his demands would be met. Rubrecht then gave Delgado a new telephone number to reach him, and Delgado told him that someone would be back in touch with him. That evening, Delgado flew back to Chicago under an assumed name.

On the same day that Delgado met Rubrecht, Garcia and others visited Lopez at Leavenworth. After the meeting, Lopez told Lebosky that the purpose of the visit was to find out whether the telephone call had in fact taken place; Lopez said that he had learned that it had.

The next day, Garcia visited Lopez again. In a private conversation, they discussed the "gifts" that she was buying. Lopez asked her about their "construction," in what condition they arrived and whether the gifts arrived complete. He told her that he needed to know right away because "someone else might want to be rewarded [or compensated] as soon as possible." In the weeks that followed, Lopez continued to ask Garcia for information. On April 4, Lopez called her and told her that he needed to know if "some toys" had been "picked up or not," noting that it was "very important." When Garcia said "not yet," Lopez replied, "Well, we'll see what happens." Two days later, Lopez told Lebosky that he had been unable to make contact with someone in Chicago.

On April 7, 1985, Lopez made another call to Garcia. Using the "toy" terminology again, Garcia told Lopez that the "toys" came in parts, that one of the "parts" was expensive, and that it was uncertain when the parts would be available. Garcia told Lopez that she "told him that" she "would go back again," and that she had been instructed to check back every now and then. A few hours later, Lopez told Sababu and Lebosky that his people had received "half of the stuff."

Later that night, at approximately 9:30 p.m., Rubrecht received a telephone call at the telephone number he gave to Delgado from someone who asked to speak to "Moe". Rubrecht asked, "Who's this, Ray?" The caller said "no" and simply

referred to "Dallas". The caller said he was phoning to set a "date to pick up some merchandise." He ordered $6,000 worth of C–4 explosives and said of the list of weapons that "we want to get that later.... Yes, we're very interested." Rubrecht and the caller agreed that the meeting would take place on May 4, 1985. They also agreed that the weapons would be paid for at the time of transfer. Rubrecht asked whether "Ray" (referring to Delgado) would meet him. The caller said, "see, Ray may not go." Rubrecht said he would wear jeans and a shirt, and the caller said his "person" would wear jeans, a tan windbreaker, tan sneakers, and a blue baseball cap. Rubrecht and the caller also agreed on passwords that each party would use to identify himself. The caller said he would phone back in several days to set the exact location of the meeting place.

Two days later, Rubrecht received another call at the new number. He and the caller decided that the weapons sale would take place in a motel parking lot in Baton Rouge, Louisiana, at 4 p.m. on Saturday, May 4. The caller asked Rubrecht whether the $1,000 given to him in Dallas would be deducted from the $6,000 purchase price; Rubrecht said no.

On April 13, after visits from his mother-in-law and from his attorney's paralegal, Lopez talked to Lebosky and appeared quite angry. He told Lebosky that the weapons dealer did not have the things that they went down for and that the weapons dealer now wanted them to pay for the weapons when they were picked up, as opposed to later. Lopez told Lebosky to call the Houston attorney and tell him what the weapons dealer was doing. Lopez said he was not going to do business with the weapons dealer unless he stuck to his original agreement.

As part of the undercover ruse, Lebosky later told Lopez that he had called the attorney in Houston. Lebosky said that the Houston attorney had explained that the weapons dealer needed payment up front because he was a "small guy" who did not have the funds to buy everything. When Lebosky reported that the Houston attorney said "his [Lopez's] people had looked at some other stuff," Lopez acknowledged that he knew that his people were looking at some other things and that $1,000 had been paid to the weapons dealer.

On April 17, Lopez called Garcia and talked about buying "uniforms" for a "jogging program." He told her to use her own money if she was going to buy "uniforms." She replied that if the "uniforms" were too expensive, she would only buy what she could afford. Lopez told her, "The ones that you had ordered I think they should already be for sale." On or about the same day, Lopez told Lebosky that another meeting had been set between the weapons dealer and his people. His people, he said, would meet the dealer with money in hand.

On the afternoon of May 4, 1985, Rubrecht, along with fellow undercover agent James Judd, waited in the motel parking lot in Baton Rouge, Louisiana, for the weapons purchaser to arrive. A man arrived at the parking lot dressed in the prearranged outfit of a blue baseball cap, tan windbreaker, and jeans. He called himself "Bill", but was later identified as fugitive defendant Claude Marks. They exchanged the agreed upon passwords and quickly got down to business. Marks produced an envelope containing cash from his pocket. Although the agreed-upon price for the weapons had been $6,000, the envelope contained only $5,000. Rubrecht said to Marks, "Your man told you wrong, son ... That grand was my travelin' money ... I'll sell you five thousand dollars worth." Marks responded, "I don't even know what I'm getting. So. I was told five and to meet ya." Marks said to Rubrecht and the other agent that if it had been "[his] game from the jump," he would "not do this." He apologized again, later explaining "I'm on the last leg of a series of complex communications...." Rubrecht proceeded to sell him thirty sticks of phony C–4 explosives.

Unbeknownst to Marks, FBI agents had "bugged" his rental car during his meeting with Rubrecht. After the meeting, Marks

was overheard picking up fugitive defendant Donna Jean Willmott and telling her about the weapons purchase. Discussing the mix-up on price, Marks commented, "About the money ... that's the sort of sh*t that can get somebody ... killed, ya know." Marks added, "I think the word ought to get back ..." Marks told Willmott, "It wasn't my trip ya know." Later, discussing Agents Rubrecht and Judd again, Marks said, "I thought my dealings with ahhh ... the Puerto Ricans were crazy, boy, they weren't nearly as crazy as this." The following day, Marks and Willmott boarded a Greyhound bus to Houston. In Houston, the two took the Amtrak train to Pomona, California, where they arrived on May 8, 1985. Marks stored the explosives he bought in Louisiana at a storage facility in Bloomington, California.

In mid-May, 1985, Lopez told Lebosky that he was still trying to find out what took place at the meeting in Baton Rouge, but he was going to have to wait for a visit because he was not getting the information over the telephone. On May 11, Lopez told Lebosky that he had learned that the only thing his people had picked up from the weapons dealer was explosives. Lopez said he was not going to deal with the weapons dealer any more because he believed the dealer was trying to get back the money Lebosky (supposedly) gave him, as well as the money Lopez's people had paid. Lopez said his people would "take care of" the weapons dealer if he had set them up in any way.

After several visits from Garcia, Lopez told Lebosky and Sababu that he would not be able to tell them much in the future, because there was a lot of "heat" on his people outside and he was not going to be able to learn much himself. Lopez said that there was now a federation of groups that included the Black Liberation Army, the FALN, the May 19th Organization, the Family, and the Weathermen that had to give approval for the planned escape. Because of the recent arrests of several of its leaders, however, the Federation had to keep a low profile, and Lopez and his people had to do the same. Lopez also explained to Lebosky that because of the

"heat", he no longer had a helicopter and pilot available to him. Therefore, Lopez said, Cobb was going to have to learn how to pilot a helicopter. Lopez told Lebosky that he should arrange to give $2,000 of the $20,000 that Lebosky allegedly had given to Cobb so that Cobb would have the money when he got out of prison.

Lopez also talked to Cobb about his visit. He told Cobb that the helicopter and helicopter pilot were on hold because of the arrests, and that Lopez's people were going to have to learn who had been compromised by the arrest. Cobb did not think that the weapons transaction had been affected by the arrests.

Towards the end of the week of May 27, Cobb informed Lebosky that when he got out of prison, he would be getting some explosives from Lopez's people. Cobb said that his plan was to hijack a helicopter and fly into the penitentiary to get the men. Cobb also said that Lopez's people were going to give him a short course on how helicopters should be operated. Cobb planned to do this so that when he took a pilot hostage to fly the helicopter, he could be sure that the pilot was doing the right things.

Meanwhile, Marks, Willmott, and two others were living in a house in Van Nuys, California. While Marks was away from home, FBI agents placed a radio transmitter under the dashboard of his car. On the morning of June 7, FBI agents saw Marks get into his car in front of his house and peer under the dashboard. Marks immediately emerged from his car in what an agent later described as a "semi-frenzied" state. For the rest of the day, there was continual traffic in and out of the house. At 3:30 p.m., agents saw Marks emerge from his house carrying some packages, which he placed in his car. Marks drove to a parking lot at the Van Nuys airport and parked his car next to a dumpster. An FBI agent who drove to the parking lot immediately after Marks left retrieved from the dumpster two gray envelopes containing a pilot test handbook, a weather service manual, various aviation material, and some aviation maps.

Thereafter, an FBI agent searched the storage unit Marks had rented and found two large plastic trash bags containing the 30 blocks of phony C-4 explosives that Marks had purchased from Agent Rubrecht. Several days later, FBI agents searched the Van Nuys residence where Marks and Willmott had been living. In the garage, they found three footlockers containing ammunition, including .45 caliber, .22 caliber, .357 caliber bullets, and gunpowder. Claude Marks and Donna Jean Willmott were not seen again after June 7, 1985, and were still fugitives at the time of trial.

On June 29, 1985, Cobb was released from Leavenworth prison to a halfway house in Denver, Colorado. Prior to his release, Cobb did not know what weapons had been picked up, but was told by Sababu that whatever had been purchased from the weapons dealer would come to Cobb for use in the escape. Shortly thereafter, Lopez informed Cobb that one of his people, a woman in Denver, was going to deliver the weapons to Cobb after his release. After he was released from prison, Cobb was supposed to send word of his address and of secure meeting places.

Cobb, Lopez, Sababu, and Lebosky later agreed that Lebosky would send $2,000 to Cobb's mother, so that Cobb could buy false identification if he had to. Cobb told Lopez, Sababu, and Lebosky that once he got out of prison he intended to get money by robbing a bank or by committing other criminal acts. After his release, Cobb secured a post office box and a telephone number. In July, Cobb sent this information to Sababu through an encrypted letter written in lemon juice. On July 20, Sababu called Cobb in Denver, and told him that "Shorty's [Lopez's] end was ready." Sababu then referred to the subject of helicopter flight training, telling Cobb that "someone has been contacted to show you how to go up in the air."

About a week later, Sababu called Cobb again. In this conversation, Cobb mentioned that he still had not received any money from Lebosky. Cobb then gave Sababu information on the post office box he

had secured. He told Sababu to address his letters to "Charles Napier" at the post office box address he had obtained in Arvada, Colorado. Sababu told Cobb that the helicopter lessons were still available and directed Cobb to "go ahead" with "whatever types of procurements" he had access to.

Shortly thereafter, Sababu spoke with Lopez and reported that Cobb had said nothing was happening because he had not received the money that Lebosky was supposed to send him. In turn, Lopez told Lebosky that Cobb had not received the money and that Lopez's people were unable to pick up the weapons they were supposed to get. Lebosky said that he had been assured that the money had been sent. (In fact, Lebosky had not sent $2,000 to Cobb.) With regard to the pick-up of the weapons, Lebosky said he had no control over the weapons dealer.

Lopez and fellow inmate Timothy Blunk had visits on July 27 and 28 from Lopez's mother-in-law and attorney's paralegal. During these visits, Lopez communicated largely through writing. During the second day of the visit, Lopez wrote a full page on a legal pad, carefully folded it up and hid it under other pages of the pad; the pad was taken out of the prison room by Delgado. The next day, a letter was mailed from Kansas City to Richard Cobb under his "Charles Napier" alias.

Sababu next called Cobb on August 3 and asked him whether he had received a letter. Sababu told Cobb that there was "something to be explained", that "something happened." When Cobb asked Sababu whether the letter concerned something good, Sababu said that "It's bad," adding that "The property that was purchased, you know, six thousand dollars worth of it was uh, was lost." Sababu then said that there was an "abort" because "little black boxes" were found. Sababu reminded Cobb that he (Cobb) was going to get some money from Lebosky, but Cobb said that he was not going to need Lebosky's money. At the time, Cobb was planning to embezzle money from the company he was working for. (Cobb later altered two payroll

checks from $500 to $2,500, netting him $4,000.)

Shortly thereafter, Cobb received a letter addressed to "Charles Napier" from Lopez and postmarked from Kansas City. The letter was folded and written on lined yellow legal paper. The first sentence of the letter read, "The things that I promised you, when they were moved, they had to be abandoned." Cobb understood this to mean that the weapons picked up from the weapons dealer had been abandoned. The letter then stated that the "training program that had been established for you has been cancelled until further notice." Cobb understood this to mean that the helicopter training program, and the weapons familiarization program had been abandoned until further notice.

Sababu and Lopez called Cobb again on August 10. In that conversation, Cobb told Lopez that he had received his letter and asked Lopez how long he would have to wait "until things would be started again." Later, in that same month, Cobb had a series of phone conversations with Sababu in which they discussed alternative sources of weapons. Sababu had directed Cobb to make his own "procurements." Accordingly, in September 1985, Cobb and his brother burglarized a gun store in Denver, stealing several pistols, a semi-automatic machine pistol, and a Mac–10 automatic with a silencer. Cobb intended to use all of the weapons in the escape.

On October 5, 1985, Sababu called Cobb. Using coded language, Cobb told Sababu that he had obtained some weapons. Sababu told Lebosky that Cobb was "getting things together outside." Cobb shortly thereafter received a letter from Sababu containing a coded message written in lemon juice. The letter contained the weapon dealer's (Agent Rubrecht) telephone number, and also queried, "Have you procured any T–E yet?" Cobb understood "T–E" to refer to weapons or explosives.

In mid-October, Cobb decided to quit his involvement in the conspiracy. His decision to quit was based, in part, on his realization that he had been under FBI surveillance since the day he left Leaven-

worth. On October 14, 1985, he turned himself in, began cooperating with the FBI, and began recording telephone calls from Sababu, Lopez and others. The first call recorded by Cobb came from Sababu on October 15. Speaking in code, Cobb told Sababu that he had stolen small automatic guns, rather than full assault rifles and that he had located a safehouse. Cobb asked Sababu what the time frame was for the escape, and Sababu replied that it would be six months.

At the end of December, Sababu told Lebosky that Lopez was "slow-playing" everything. Sababu told Lebosky that Cobb had weapons and a safehouse and was ready to help them escape from prison. Sababu said Cobb was just waiting for Lopez's people to get in touch with him. Lopez and Cobb talked on December 29, 1985. Lopez said that things were going slowly because of unanticipated complications. Referring to certain arrests that had affected the timing of the escape plan, Lopez told Cobb, "I'm gonna try to send you some stuff so you can get ah, ah, an idea of the magnitude of wh-what came down."

By the end of 1985, the conspirators inside Leavenworth concluded that they would have to revise their escape plan and locate a new source of weapons. To this end, they enlisted the aid of David Bryant, another recently released inmate. On November 28, 1985, Lopez called Bryant and told him he would send a lawyer to see him. In January 1986, Sababu called Cobb in Colorado five times to discuss the changing escape plan. In those calls, Sababu advised Cobb that a lawyer was going to act as an intermediary and call Bryant, and that Cobb should "prepare an agenda" for Bryant. Several weeks later, Sababu delivered the news to Cobb that anti-helicopter wires had been strung across the prison yard at Leavenworth.

Plans continued to develop in February. In one call, Sababu told Cobb that Lopez "seems enthused that something will happen and that uh, you know, things will develop, right." Sababu instructed Cobb to "take all the initiative on everything" with

regard to Bryant. Several days later, Sababu told Cobb that he needed his address because Lopez said he wanted it. Sababu said Lopez needed the address for a "good" reason and suggested that the address would be passed at a prison visit scheduled to take place the next day.

Sababu and Lopez called Cobb again on April 3, 1986. Sababu told Cobb that Lopez's people were being cautious because of grand jury investigations, and suggested once again to Cobb that he find another source for weapons. Sababu told Cobb to be "completely independent", which Cobb understood to mean that it was up to him, and "whoever else" to obtain the weapons, explosives and a safehouse. Notwithstanding that, Sababu indicated that Lopez was still willing "to do everything that he indicated he would do...." A few days later, Sababu arranged for another inmate to phone Cobb and tell him to go with "Plan B."

On April 11, Cobb returned to Leavenworth Prison to visit Sababu. His visit was accomplished with the help and direction of the FBI. Cobb used the name "Charles Napier" at the prison and disguised his appearance by shaving, cutting his hair, and donning glasses. Cobb and Sababu talked for several hours in the Leavenworth visiting room. Sababu again told Cobb that anti-helicopter wires had been strung across the prison recreation yard. In view of that, Sababu suggested a possible alternate approach for the escape helicopter, drawing diagrams to illustrate possible approaches. Sababu advised Cobb to blow up the northeast guard tower with a LAW rocket. Sababu told Cobb that in light of the incident with the weapons purchased from "Moe," Lopez and his people were extremely worried. Sababu assured Cobb, however, that Lopez and his people had investigated the incident and had determined that Cobb was not responsible for it. Lopez's people believed that "Moe" and Lebosky were responsible. When Cobb asked Sababu whether Lopez was going to provide anything, Sababu said no, but added that he would ask Lopez whether his people could supply a helicopter or any equipment. Sababu also said that the con-

spirators intended to approach fellow inmate Timothy Blunk to find out whether he could supply weapons or a helicopter. Sababu told Cobb he was going to send $100 to David Bryant so that Bryant and Cobb could meet to discuss the escape plan.

Cobb reported to Bryant on April 16 that Lopez was still trying to get a helicopter pilot, and that Blunk possibly had some weapons and financing resources. Several days later, Sababu informed Cobb that they were checking the background of Blunk's source. Sababu told Cobb that Blunk's source was going to require $50,000 up front. Sababu said that Lopez was mailing Cobb the address of the weapons dealer, whom Sababu referred to as "that other party for the property."

In a phone call several days later, Sababu told Cobb that when Cobb met with the weapons dealer, he should make an appraisal of the merchandise that was available. Sababu said that if the "purchasing angle" did not work out, "you have the other option." Cobb understood this to mean that he should murder the weapons dealer if he would not cooperate with Cobb. Sababu said that the weapons dealer would have available five hundred "pineapples" (grenades), 100 M–16s and plastic explosives.

Following this phone call, Cobb received a letter addressed to "Charles Napier," bearing the postmark of O'Hare Airport. The letter also bore the fingerprint of Lopez. The letter contained directions on how to find the weapons dealer, Michael Neece. The letter listed Neece's address as Poplar Bluff, Missouri and included a diagram of his home. The letter also advised that Neece "works alone, except during hunting season. Alarm at store consists of night burglary alarms. Keeps pistol in top desk drawer." A part of the letter appeared to be missing.

Sababu and Lopez called Cobb on May 14 and discussed the letter. Cobb told Lopez that part of the letter he had sent had been cut off. Lopez said he would send the letter again. When Cobb asked Sababu whether he could get some money to check

out the weapons dealer, Sababu said he had sent $500 to Cobb. In a phone call several days later, Sababu again broached the subject of murdering Neece. Referring to his earlier directive that Cobb should either deal with Neece or kill him, Sababu said that "[p]art two of the last discussion" was the "way it that has to be done." Sababu assured Cobb that he, Lopez, Blunk and Blunk's contact were all in agreement about the murder plan.

At the end of May, Dora Garcia visited Lopez in prison and discussed false identification. In videotaped visits on May 24 and 25, Garcia and Lopez communicated largely through writings. One of the writings was a set of numbered questions written by Garcia. With Garcia's questions at his side, on May 25, Lopez wrote corresponding answers. In one of her written questions, Garcia asked about using the social security number of other individuals. Lopez replied that the best alternative was to use the social security number of a dead person. Garcia also asked about whether driver's license numbers could be made up and whether the typeset used would be traceable. Lopez counseled her about the cost and availability of equipment to fabricate drivers licenses.

In her questions, Garcia offered her thoughts about what had happened the year before. She wrote that "One of the theories of [Marks and Willmott] was that they were followed to the place ..." "Those things", she explained, "remained where they were deposited." As noted earlier, Marks and Willmott were surveilled from Louisiana to California, where they stored the phony C–4 explosives in a locker in Bloomington, California. The explosives remained in the locker until they were recovered by the FBI.

Garcia also made a veiled reference to a "person" and asked Lopez if he had written back to him. Lopez wrote of the "person's" visit to the prison, his changed appearance during the visit, and his reported success in obtaining a "house", "equipment" and necessary papers. As noted earlier, Cobb visited Sababu in prison after changing his appearance. In that visit,

Cobb and Sababu discussed Cobb's efforts in obtaining a safehouse, weapons and false identification. Referring to Cobb's request for a cash advance to deal with Neece, Lopez wrote "This time he has asked for a specific sum of money needed to continue work as he would have to leave the job he has now." Pondering whether to "suspend things," Lopez wrote about "mistakes and possible infiltrations" and warned Garcia that no more mistakes could be made.

The last "infiltration" was made that day, as the questions and answers were seized pursuant to a search warrant and the plot was foiled. Six defendants were charged in an eight-count indictment. Count 1 charged the defendants with committing a multi-goal conspiracy to effect the escape of several inmates from the Leavenworth federal penitentiary; to transport explosives with intent to kill and injure people; and to use explosives to destroy government buildings and property. Counts 2 and 3 charged Delgado with violating the Travel Act, 18 U.S.C. § 1952(a)(3). Counts 4, 5 and 8 charged Garcia with violating the Travel Act. Counts 6 and 7 charged Garcia and Lopez with jointly violating the Travel Act.

Four of the defendants—Oscar Lopez, Kojo Sababu, Jaime Delgado and Dora Garcia—went to trial. At trial, only Garcia put on a defense. Lopez took little role in the trial, asserting a prisoner of war status and contesting the court's jurisdiction over him. After a ten week trial, the jury found Lopez, Sababu, Garcia and Delgado guilty on the Count 1 conspiracy charge, Delgado guilty on Counts 2 and 3, Lopez and Garcia guilty on Count 7, and Garcia guilty on Count 8. Delgado was sentenced to a four-year sentence to be followed by five years of probation. Garcia received a three-year sentence with five years of probation. Sababu was sentenced to serve a five-year sentence, to run consecutively to the prison sentence he was already serving. Lopez was sentenced to serve a fifteen-year sentence, also to run consecutively to the prison sentence he was already serving. Defendants challenge their convictions on appeal. We affirm on all counts.

## II. The Conspiracy Claim

The defendants' first claim on appeal concerns their convictions on the Count 1 conspiracy charge. They argue that the evidence at trial established not one single conspiracy as alleged in the indictment, but rather three separate and distinct conspiracies: (1) the escape conspiracy; (2) a separate weapons conspiracy: and (3) the "Neece" conspiracy to steal and murder. The defendants contend that because the evidence showed the existence of these three separate and distinct conspiracies rather than one single massive conspiracy, there was a fatal variance between the proof at trial and the indictment, and accordingly, their convictions should be overturned. We disagree.

In order to establish the crime of conspiracy, the government must prove that there was an agreement between two or more persons to commit an unlawful act, that a defendant was a party to the agreement, and that an overt act was committed in furtherance of the agreement by one of the co-conspirators. *See e.g., United States v. Noble,* 754 F.2d 1324, 1328 (7th Cir.1985), *cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985); *United States v. Madison,* 689 F.2d 1300, 1310 (7th Cir.1983), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983). It is the nature and scope of the agreement that is the determinative factor in distinguishing between single and multiple conspiracies. *United States v. Towers,* 775 F.2d 184, 189 (7th Cir.1985). Separate conspiracies exist when each of the conspirators' agreements has its own end, and each constitutes an end in itself. *Blumenthal v. United States,* 332 U.S. 539, 558–59, 68 S.Ct. 248, 257–58, 92 L.Ed. 154 (1947); *United States v. Napue,* 834 F.2d 1311, 1332 (7th Cir. 1987). If there is "one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among the parties constitutes a single conspiracy." *United States v. Varelli,* 407 F.2d 735, 742 (7th Cir.1969), *cert. denied,* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972).

Whether the evidence at trial established a single conspiracy is a question of fact for the jury. *United States v. Whaley,* 830 F.2d 1469, 1472 (7th Cir.1987); *United States v. Hawkins,* 661 F.2d 436, 457 (5th Cir.1981). Accordingly, we must view the evidence in the light most favorable to the government and we must uphold the jury's finding of a single conspiracy unless no rational trier of fact could have found a single conspiracy based on the evidence presented at trial. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Whaley,* 830 F.2d at 1474. We give deference to the jury's weighing of the evidence and its drawing of reasonable inferences. *Id.* at 1472. With these principles serving as our guide, we examine the alleged three conspiracies to determine whether they were part of a larger single conspiracy.

### A. The Neece Plan

Defendants argue that the effort to use Missouri arms dealer Michael Neece as an alternative weapons source was unrelated to the escape plan and thus constituted a separate and distinct conspiracy. More precisely, they contend that the Neece plan was a separate conspiracy because new people joined the group and also because the defendants allegedly had no control over it. We find that both arguments lack merit.

It is a basic tenet of conspiracy law that a new party can join a single, on-going conspiracy at any time. *United States v. Davis,* 838 F.2d 909, 914 (7th Cir.1988); *United States v. Hutul,* 416 F.2d 607, 618 (7th Cir.1969). "As long as the conspiracy continues and its goal is to achieve a common objective ... parties may still be found guilty even though they may join or terminate their relationship with the core conspirators at different times." *Noble,* 754 F.2d at 1329; *Davis,* 838 F.2d at 913. The key question is not, as the defendants assert, whether different parties have joined the conspiracy, but instead whether the conspirators are performing different functions in pursuit of common criminal objectives. *Napue,* 834 F.2d at 1332. In

the instant case, it was reasonable for the jury to find that the "Neece Plan" involved new members but was undertaken in pursuit of the same criminal objectives: to procure weapons to aid in the escape from Leavenworth and to begin the "armed struggle." New members joining the conspiracy a year after it had begun does not undercut the jury's finding of a single conspiracy.

■ Moreover, whether a conspiracy is multiple or singular is not governed by the degree of "control" exercised by the individual conspirators. Once an individual "embark[s] upon a criminal venture of indefinite outline, he [takes] his chances as to its content and membership." *United States v. Ras*, 713 F.2d 311, 313 (7th Cir. 1983). The parties involved in a conspiracy do not have to know the other conspirators or participate in every aspect of the conspiracy. *Noble*, 754 F.2d at 1329; *Davis*, 838 F.2d at 913. All that is required is that the conspirators knowingly embrace the common criminal objectives. *Hutul*, 416 F.2d at 619. Accordingly, the proper inquiry is not whether the defendants controlled all aspects of the conspiracy, but rather whether the Neece plan was part of the single overreaching conspiracy embraced by the defendants. *United States v. Diaz*, 864 F.2d 544, 548 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989). There was ample evidence adduced at trial for the jury to conclude that the Neece plan was part of the charged conspiracy. When the defendants became disenchanted with their weapons source, they expressly directed Cobb to begin searching for a new source. When Cobb later visited the prison, Sababu told him about Blunk and Cobb described his meeting with Neece. Sababu characterized the procurement of the weapons as the "linchpin" to all of their plans. A review of the record reveals that the evidence is overwhelming that the escape hinged on Cobb's transaction with Neece.

■ In summary, the Neece plan was part of the single conspiracy charged in Count 1 of the indictment. That new members joined the conspiracy and the old members were not integrally involved does not mandate a different result. It was reasonable for the jury to find that the Neece plan was part of "one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, [and thus] the agreement among the parties constitutes a single conspiracy." *Varelli*, 407 F.2d at 742.

### B. The California Weapons

■ Defendants next contend that the "California" conspiracy involving defendants Marks and Willmott was a separate and wholly unrelated conspiracy as the government failed to present evidence linking Marks and Willmott to the Leavenworth escape plan. This claim finds no support in the record.

The government presented ample evidence at trial for the jury to find that the purchase of phony C-4 explosives was in direct furtherance of the overall conspiracy to purchase weapons and escape from Leavenworth. The sale of the explosives to Marks in Louisiana was arranged through a series of telephone calls to Agent Rubrecht at the new telephone number that he had provided exclusively to Delgado during Delgado's trip to Dallas. When Rubrecht met with Marks in Louisiana to consummate the sale, Marks told him that he was not acting alone. When Marks found that he did not have the amount of money required, he apologized to Rubrecht telling him that "I'm on the last leg of a series of complex communications." When Donna Jean Willmott asked Marks whether the weapons dealer knew who Marks was, Marks replied, "they don't know if the last guy was Mexican or what." Marks told Willmott that he did not tell the weapons dealer that he was working with others, so the dealer mistakenly thought that he was selling to an individual. Marks observed that "I gather they both flew to Dallas." Finally, he remarked that "I thought my dealings with ... Puerto Ricans were crazy, boy, they weren't nearly as crazy as this." Later, in talking to Lopez, Garcia referred to the

California episode and speculated about the location of the explosives purchased by Marks. The loss of the explosives in California was a major blow to the escape plan and served to force the conspirators to approach Neece for more explosives and weapons. This evidence, taken together, supports the jury's finding that the purchase and transportation of the C–4 explosives by Willmott and Marks was a part of the conspiracy to escape from Leavenworth.

### C. The Escape Conspiracy

 Defendants Delgado and Garcia contend that they were not part of the plot to effect the escape of the Leavenworth inmates. As stated earlier, however, all of the conspirators need not participate in every aspect of the conspiracy in order to be guilty of a single conspiracy. *Davis,* 838 F.2d at 913. As long as they knowingly embraced the same criminal objective, they participated in a single conspiracy. *Id.* at 913; *Noble,* 754 F.2d at 1329. We find there was sufficient evidence for the jury to conclude that they embraced the criminal objectives alleged in Count 1.

 In any event, Delgado and Garcia were clearly involved in the escape plan. Once a conspiracy has been shown to exist, only slight evidence is needed to establish a defendant's participation in that conspiracy. *United States v. Marren et al.,* 890 F.2d 924, 933 (7th Cir.1989); *see United States v. Ortiz,* 883 F.2d 515, 523 (7th Cir.1989) (Easterbrook, J., concurring). Delgado was the key participant in the meeting with Agent Rubrecht, who was posing as an arms dealer. This meeting was set up by Lopez, who was given Rubrecht's telephone number by Lebosky. Delgado travelled to Dallas to meet with Rubrecht. Upon arrival, Delgado discussed with Rubrecht the weapons that were on the inmates' shopping list and he asked Rubrecht for the same number of AR15's that Sababu had told Lebosky they would need for the escape. Finally, it was through Delgado that the conspirators learned what Rubrecht had in his arsenal, as well as his new telephone number and

his code name "Moe." Delgado's negotiations laid the groundwork for the subsequent purchase of the phony C–4 explosives by Marks and Willmott—an event repeatedly discussed and analyzed the following year by the incarcerated conspirators.

The government also provided sufficient evidence of Garcia's membership in the conspiracy. She frequently spoke with Lopez over the phone and visited Lopez numerous times at Leavenworth. The government demonstrated at trial that during these encounters she discussed, often in code, both the weapons purchase and the escape plan. A rational juror could have found that her strategically-timed calls and visits to the prison, as well as her various comments concerning "toys" and "jogging uniforms" betrayed knowledge and participation in the escape plan. The jury heard several conversations between Lopez and Garcia which, in the context of Lebosky's testimony and Delgado's trip to Dallas, it was entitled to infer were coded conversations about armaments and the escape. In her final prison visit, her written questions and comments evidenced her knowledge of the conspiracy as she asked Lopez about Cobb and false identification and speculated about Marks and Willmott. Based on this evidence, it was reasonable for the jury to find that she embraced the criminal objectives of the conspiracy.

 In summary, the government proved at trial that the defendants were all part of a single, multi-goal conspiracy rather than part of three separate conspiracies. Therefore, the defendants' claim of a fatal variance between the indictment and the proof at trial is without merit.

### III. *Voir Dire*

 The defendants claim that the district court's refusal to question potential jurors during *voir dire* on the issues of burden of proof and the presumption of innocence deprived them of a fair trial. They contend that this refusal denied them a basis for a reasonably knowledgeable exercise of their right to challenge jurors. We disagree.

Although we have not squarely addressed whether a district court must question the jury on these issues during *voir dire*, we have repeatedly held that a judge has broad discretion in determining what questions may be asked during *voir dire*. *See, e.g., United States v. Hasting*, 739 F.2d 1269, 1272 (7th Cir.1984), *cert. denied*, 469 U.S. 1218, 105 S.Ct. 1199, 84 L.Ed.2d 343 (1985); *Fietzer v. Ford Motor Co.*, 622 F.2d 281, 284 (7th Cir.1980). We have stated that "[t]his court will not find that a trial court abused its discretion in conducting *voir dire* where there is sufficient questioning to produce, in light of the factual situation involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right of challenge." *United States v. Hasting*, 739 F.2d at 1273 (citing *United States v. Martin*, 507 F.2d 428, 432 (7th Cir.1974)) (quoting *United States v. Lewin*, 467 F.2d 1132, 1137 (7th Cir.1972)).

In the instant case, the defendants have made no showing that the district court's *voir dire* failed to provide a basis for the exercise of the right to challenge. They rely on generalized statements concerning the importance of ferreting out biased jurors and do not cite to any facts suggesting that they were denied an adequate basis for a "reasonably knowledgeable exercise of the right to challenge." Indeed, the district court instructed the jury on the burden of proof and the presumption of innocence numerous times during the trial.

Defendants' rely primarily upon *United States v. Hill*, 738 F.2d 152 (6th Cir.1984), to support the claim that the district court's questioning during *voir dire* was inadequate. In *Hill*, a divided Sixth Circuit panel held that the district court abused its discretion in refusing to question prospective jurors on the issues of presumption of innocence and burden of proof. The per se rule in *Hill* is inconsistent with the discretion afforded the trial judge during *voir dire*. Accordingly, we reject *Hill*. In doing so, we are in accord with every other court of appeal that has addressed the issue. *See United States v. Robinson*, 804 F.2d 280 (4th Cir.1986); *United States v. Miller*, 758 F.2d 570 (11th Cir.1985), *cert.*

*denied*, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985); *United States v. Price*, 577 F.2d 1356 (9th Cir.1977), *cert. denied*, 439 U.S. 1068, 99 S.Ct. 835, 59 L.Ed.2d 33 (1979); *United States v. Ledee*, 549 F.2d 990 (5th Cir.1977), *cert. denied*, 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188 (1977); *United States v. Cosby*, 529 F.2d 143 (8th Cir.1976), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976); *United States v. Wooton*, 518 F.2d 943 (3d Cir. 1975), *cert. denied*, 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975); *United States v. Gillette*, 383 F.2d 843 (2d Cir.1967); *Grandsinger v. United States*, 332 F.2d 80 (10th Cir.1964).

The defendant has failed to demonstrate the inadequacy of the questioning during *voir dire*. Therefore, we find that the district court did not err in refusing to question the jury regarding the burden of proof and presumption of innocence.

### IV. The Special Verdict Claim

The defendants next argue that the district court erred in failing to provide the jury with special verdict forms requiring them to make special findings concerning each of the alleged objects of the conspiracy charged in Count 1. They apparently contend that because of the multiple goals charged in the conspiracy count, the failure to provide the jury with the forms allowed the jury to convict without a unanimous decision as to which of the goals each defendant conspired to reach.

We begin by noting that this Court has embraced the principle that special verdicts are disfavored in criminal cases because they conflict with the basic tenet that juries must be free from judicial control and pressure in reaching their verdicts. *United States v. Jackson*, 542 F.2d 403, 413 (7th Cir.1976). The defendants provide us with no cases or other authority—and we can find none on our own—that require a district court to provide a jury with proffered special verdict forms. In the instant case, the district court's instructions correctly incorporated the unanimity requirement. The jury was instructed that its verdict, "whether it be guilty or not guilty, must be

unanimous," and that "you must unanimously find that he or she was a member of the conspiracy charged in the indictment and not a member of some other conspiracy." Further, the instruction on the conspiracy charge stressed to the jurors that they must unanimously agree on which of the alleged objects of the conspiracy the defendants agreed to commit.[5] We believe that the court's instructions correctly incorporated the unanimity requirement and we reject the defendants' claim.[6]

## V. Government Misconduct

Defendants next argue that their due process rights were violated by "outrageous government conduct" both before and during the trial. Specifically, they make two claims of government misconduct. First, they argue that "but for" the participation of Cobb and Lebosky, both eventual government informants, there would have been no escape plan. They contend that the alleged prison escape was "just idle prison talk" and that the government manufactured the charged conspiracy by providing Lebosky with a weapons contact and assisting Cobb in his attempts to procure weapons for the escape. Second, they charge the government violated their due process and sixth amendment rights when, during trial, an FBI case agent

searched a wastebasket under the defense table and seized defense work product.

 The outrageous conduct defense stems from a statement in *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1978), in which the Court noted that it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." Like the Supreme Court, this court has left the possibility open, although we have never reversed a conviction on this ground. *United States v. D'Antoni*, 874 F.2d 1214 (7th Cir.1989). We recently noted, however, that the continued vitality of the doctrine is questionable given the holding of a three-justice plurality in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). *See D'Antoni*, 874 F.2d at 1219; *United States v. Bontkowski*, 865 F.2d 129, 131 (7th Cir. 1989). The *Hampton* plurality held that "[t]he remedy of the criminal defendant with respect to acts of government agents, which far from being resisted, are encouraged by him, lies solely in the defense of entrapment." *Hampton*, 425 U.S. at 489, 96 S.Ct. at 1649. "An examination of the post–*Hampton* cases decided by the courts of appeal indicates that due process grants

---

**5.** The district court instructed the jury as follows, in pertinent part:

> What you must do is determine whether the conspiracy ... alleged in Count 1 existed between two or more conspirators.... if you decide that such a conspiracy did exist, you must then determine who the members were; and, if you should find that a particular defendant was a member of some other conspiracy, not the one charged in the indictment, then you must acquit that defendant.
> Count 1 of the indictment charge[s] that the defendants conspired to commit different offenses. In other words, it is charged that *defendants conspired to commit different, separate substantive crimes or offenses*.
> In such a case, it is not necessary for the government to prove that the defendant under consideration , conspired to commit all of those offenses. It would be sufficient if the government proves, beyond a reasonable doubt, that the defendant conspired with a conspirator to commit one of those offenses; but in any event, in order to return a verdict

of guilty, you must unanimously agree upon which of the different offenses the defendant conspired to commit. If you cannot agree in that manner, you must find the defendant not guilty.

**6.** Defendants cite cases for the proposition that a jury's general verdict must be reversed if it is shown that the verdict "may have been based on a ground that is unconstitutional or otherwise legally deficient." *United States v. Holguin*, 868 F.2d 201, 203 (7th Cir.1989). In the instant case, however, none of the possible grounds for the verdict were unconstitutional or legally deficient. Moreover, a conspiracy conviction will be held as long as the evidence shows that the defendants agreed to commit at least one of the alleged objectives of the conspiracy. *Id.* We find that the evidence showed that the defendants did indeed agree to the commission of the alleged objectives of the conspiracy. Therefore, there is no basis for reversal of the jury's general verdict.

wide leeway to law enforcement agencies in their investigation of crime. Assuming that no independent constitutional right has been violated, governmental conduct must be truly outrageious before due process will prevent conviction of defendant." *United States v. Kaminski*, 703 F.2d 1004, 1009 (7th Cir.1983); *Bontkowski*, 865 F.2d at 132. For the reasons stated below, we believe that the defendants' failed to demonstrate any truly outrageous government misconduct.

The defendants' assertion that the actions of the government in promoting the criminal enterprise were so overwhelming that they went beyond the boundaries of acceptable governmental activity so as to constitute a due process violation fails to find support in the record. The defendants argue that "but for" the participation of Lebosky and Cobb, both of whom became government informants during the conspiracy, there would have been no escape plan at all. An examination of the record demonstrates, however, that both Cobb and Lebosky were integrally involved in the conspiracy long before they began cooperating with the FBI. Indeed, Lopez, Sababu, Bryant and Cobb repeatedly discussed their plan to engage in an "armed struggle," their need to obtain weapons, and the need to escape long before Lebosky appeared on the scene with his offer of a weapons contact. The escape plan had been formulated and finalized before Lebosky was approached about his weapons source and Lebosky did not turn to the FBI until the conspirators had pressured him into supplying them with the telephone number of his Houston weapons contact. By that time, the conspirators had formulated their plans and had actively begun preparations for the escape. The defendants' attempt to paint Lebosky as a "mover and a shaker" of the conspiracy is wholly without support in the record. Rather, the record shows that Lebosky was instructed by government agents only to give the telephone number of the weapons dealer to the inmates. We have held that the fact that "the government may have supplied, or offered to supply, an agent of the crime does not in itself constitute out-

rageous governmental conduct." *D'Antoni*, 874 F.2d at 1220. Beyond that, he played a limited role in the conspiracy.

The same is true for Cobb. The defendants' attempt to portray Cobb as a government agent from the inception of the conspiracy finds no support in the record. The escape plot arose from discussions between Cobb, Sababu and Lopez in the Summer of 1984—Cobb did not begin cooperating with the FBI until October of 1985, more than fourteen months into the conspiracy. In the interim, the defendants plotted the escape, directed Cobb to obtain weapons, called Cobb to provide updates, negotiated the purchase of weapons from the undercover agent in Dallas and secured explosive devices and transported them to California. The defendants fail to demonstrate any government misconduct with regard to Cobb. If the defendants are asserting that the government cannot use informants, they are mistaken. It is well established that "the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). "The use of informants and the offer of a reasonable inducement are proper means of investigating crime." *Kaminski*, 703 F.2d at 1004. Indeed, "it may be safely said that investigative officers and agents may go a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process or evoke the exercise by the courts of their supervisory powers so as to deny to the officers the fruits of their misconduct." *Kaminski*, 703 F.2d at 1009 (quoting *United States v. Quinn*, 543 F.2d 640, 648 (8th Cir.1976)).

We also reject the defendants' claim that the government engaged in outrageous misconduct when, just prior to the completion of the government's case at trial, an FBI case agent removed from a wastepaper basket four pieces of paper that the defendants had discarded. The

record shows that as soon as it came to the government's attention that the agent had removed the discarded sheets of paper, the government attorneys immediately delivered the paper in a sealed envelope to defense counsel and notified the court. The FBI agent was acting on his own and was instructed by the prosecution to refrain from engaging in such conduct in the future. The government attorneys never examined the papers and the FBI agent was instructed not to disclose to the government anything he may have learned from the notes.

The defendants argue that the district court abused its discretion in denying the defendants' motion for a mistrial based on the agent's actions. We disagree. The record shows that nothing that the agent might conceivably have learned from the documents was passed on in any form to the government attorneys. Nor was any of the government's evidence derived in any way from the notes. The defendants assert that one of the pieces of paper was a sheet of notes from a defense meeting in which the defendants discussed their defense, witness presentation and closing arguments. They fail, however, to demonstrate that the discarded sheets of paper contained privileged communications, attorney work product, or sensitive information bearing on trial strategy. The district court examined the documents *in camera* and found that they did not contain any sensitive or privileged information. If indeed there was any prejudice to the defendants, we agree with the district court that it was harmless. This was apparently an isolated incident which the government did its best to rectify and did not rise to the level of outrageous government conduct envisioned in *Hampton* and *Russell* that would require reversal. We also agree with the district court that the defendants failed to "present[ ] specific facts sufficient to raise a significant doubt about the propriety of the government's actions in the investigation or prosecution of this case" to warrant an investigatory hearing. *See United States v. Swiatek,* 819 F.2d 721 (7th Cir.1987), *cert. denied,* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987).

## VI. Garcia's Privacy Claim

■ Defendant Garcia contends that the district court erred in admitting into evidence nine taped telephone conversations between her and Lopez, and that because these tapes severely prejudiced all the defendants, the defendants are entitled to a new trial without the tapes. Specifically, she argues that the admission of the tapes violated Title III of the Omnibus Crime Control and Safe Streets Act, the federal wiretapping statute, 18 U.S.C. §§ 2510 *et seq.,* and the fourth amendment's right to privacy.

The conversations in question occurred while Lopez was incarcerated at Leavenworth. Because prisoners cannot generally receive incoming calls, all of the calls were initiated by Lopez. The government argued at trial that these calls proved Garcia's role as a courier of information in the charged conspiracy. The district court held that the recordings made at Leavenworth were authorized under the federal wiretapping statute, 18 U.S.C. §§ 2510 *et seq.* The statute restricts the use in evidence of wiretaps. *See* 18 U.S.C. § 2515. Section 2510(5)(a)(ii) embodies an exception for evidence intercepted by "an investigative or law enforcement officer in the ordinary course of his duties." Section 2510(7) of the Act defines an investigative or law enforcement officer as one "who is empowered by law to conduct investigations or to make arrests for offenses enumerated in [18 U.S.C. § 2516]." The district court held that the recordings should not be suppressed because the monitoring of Lopez's telephone calls was done by a law enforcement officer in the ordinary course of his duties. Garcia challenges this holding claiming that the monitoring was not done "in the ordinary course of duty" and that the district court failed to properly construe the federal wiretapping statute in light of the fourth amendment.

We have recently held that prison officials are "investigative or law enforcement officers" within the meaning of § 2510(7). *United States v. Feekes,* 879 F.2d 1562, 1565 (7th Cir.1989); *See also United States*

*v. Paul,* 614 F.2d 115, 117 (6th Cir.) *cert. denied* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980); *United States v. Vasta,* 649 F.Supp. 974, 989 (S.D.N.Y.1986); *Crooker v. United States Dept. of Justice,* 497 F.Supp. 500, 503 (D.Conn.1980). In *Feekes,* we found that the "ordinary course" exception was "clearly satisfied" where the recordings were authorized by prison regulations and were made in accordance with established prison routine. 879 F.2d at 1565–66. Similarly, in the instant case, the monitoring of inmate telephone conversations at Leavenworth was authorized and undertaken pursuant to a specific Bureau of Prisons regulation, 28 C.F.R. § 540.101.[7] Correctional officers who conducted the monitoring and recording acted pursuant to an institutionalized, ongoing policy at the prison. Further, prisoners are notified about the monitoring policy in four different ways. First, a bilingual sign is mounted at eye level on each telephone indicating that the telephone is subject to monitoring. Second, telephone regulations are discussed during the admission and orientation briefing inmates receive when they first come into the institution. Third, notification is provided in the institutional supplements of the national policy statements on telephones. Finally, the Code of Federal Regulations provides public notice of the possibility of monitoring. Based on the above analysis, we agree with the district court that the monitoring was done by law enforcement officers in the ordinary course of duty, and, accordingly, we believe that this case falls within the ambit of § 2510(5)(a)(ii).[8]

■ Garcia also challenges the admittance of the taped conversations on constitutional grounds. She argues that notwithstanding the Title III exceptions discussed above, the recordings should have been excluded because they violated her fourth amendment right to privacy. To invoke the fourth amendment's protection, Garcia must establish a legitimate expectation of privacy in the area searched or the subject matter seized. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). We believe that Garcia did not have a reasonable expectation of privacy in her telephone conversations with Lopez, an inmate in a federal prison. Garcia was a frequent visitor to Leavenworth and was well aware of the strict security measures in place. She was put on notice through the Code of Federal Regulations that prison officials were authorized to monitor inmates' telephone calls. *See United States v. Montgomery,* 675 F.Supp. 164, 169 (S.D. N.Y.1987). Moreover, that Garcia frequently spoke in coded language demonstrated her awareness that there was no privacy to the conversations. We believe that it was unreasonable for her to expect that telephone calls she placed to an inmate in a high-security federal penitentiary would be private. As the Supreme Court has held, "[i]n prison, official surveillance has traditionally been the order of the day." Furthermore, this reduced expectation of privacy, when balanced against the legitimate governmental interests in the safe and secure operation of a penal institution, *see e.g. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), yields the inevitable conclusion that the conversations in question were not protected by the fourth amendment. In so holding, we are in agreement with the court in *Vasta* that "[i]t is difficult to imagine that the considerations that justify monitoring

---

**7.** 28 C.F.R. § 540.100 provides:

Inmate telephone use is subject to limitations and restrictions which the Warden determines are necessary to insure the security, good order, and discipline of the institution and to protect the public. The Warden shall establish procedures and facilities for inmate telephone use.

28 C.F.R. § 540.101 provides:

The Warden shall establish procedures that enable monitoring of telephone conversations on any telephone located within the institu-

tion, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public. The Warden must provide notice to the inmate of the potential monitoring.

**8.** Because we find that the recordings were properly admitted pursuant to § 2510(5)(a)(ii), we need not address the defendants' argument that the monitoring did not meet the requirements of the "consent exception" embodied at § 2511(2)(c).

and recording of a prisoner's utterances could somehow not apply at the other end of the telephone. The rights of free persons may well at times be implicated and stand or fall with the rights of prisoners." *Vasta*, 649 F.Supp. at 991.

## VII. Delgado's Claims

 Delgado raises several claims on his own, only two of which merit discussion here. Delgado first argues that the district court erred in admitting into evidence a "clandestine operations manual" and a blank New Mexico birth certificate both of which bore his fingerprints. These documents were recovered from an FALN safehouse used in a previous FALN escape conspiracy in which Delgado was not charged. Prior to trial, the government announced its intention to offer the fingerprint evidence under Fed.R.Evid. 404(b). The district court, however, granted the defendants' motion *in limine* to prohibit the government from introducing evidence of Delgado's involvement in the earlier conspiracy. The district court held that the presence of the prints did not constitute "clear and convincing" proof of his involvement in the earlier crime but reserved ruling "as to whether or not the fingerprint evidence would be admissible, independent of Fed.R.Evid. 404(b) and without reference to where it was discovered, solely in order to show Delgado's familiarity with some of the techniques used in this case." At trial, the court admitted the evidence precisely on this "non-Rule 404(b) ground." The court limited the government to presenting expert testimony that the fingerprints on the document belonged to Delgado. The government was not allowed to show the documents to the jury or elicit testimony as to where they were recovered or to suggest in any way that they were related to an earlier escape conspiracy.

The district court has broad discretion to determine the admissibility of evidence in a criminal trial. *United States v. Johnson*, 805 F.2d 753, 759–60 (7th Cir.1986). Thus, "we will reverse the district court's evidentiary rulings only upon a clear showing of abuse of discretion." *Id.* at 760 (quoting *United States v. Hattaway*, 740 F.2d 1419,

1424 (7th Cir.), *cert. denied*, 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984)). This court has held that "the trial court's assessment of relative probative value and unfair influence is generally accorded great deference because of his firsthand exposure to the evidence and his familiarity with the course of the trial proceeding." *United States v. Levy*, 741 F.2d 915, 924 (7th Cir.1984), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984). With these principles as our guide, we cannot say that the district court abused its discretion in admitting the fingerprint evidence in the limited manner in which it did. The documents were clearly probative of Delgado's knowledge of conspiracy techniques, especially considering that Delgado's principle line of defense was that he was an "unwary dupe" of the conspiracy. *See United States v. Johnson*, 805 F.2d 753, 759–60 (7th Cir.1986). We believe that the limited manner in which the evidence was allowed to be used fairly protected the defendant from any undue prejudice. The court prevented the government from eliciting where the documents had been recovered or to suggest in any way that the evidence related to an earlier escape conspiracy. The court merely permitted the FBI fingerprint specialist to testify that he had identified thirteen of Delgado's fingerprints on a manual entitled "Basic Course on Security and Clandestine Work" and three of Delgado's fingerprints on a blank New Mexico birth certificate. The jury was not permitted to examine the manual. In sum, the district court did not abuse its discretion in permitting this limited use of the evidence.

 Delgado's second claim is that he was denied a fair trial because the district court failed to grant his repeated motions for severance, which he made before, during, and after trial. His principal argument in support of this claim is that because a vast majority of the evidence adduced at trial did not pertain to him and was extremely prejudicial, he was denied a fair trial.

The decision of whether to grant or deny a motion for severance is vested in the

discretion of the district court. *United States v. Garver*, 809 F.2d 1291, 1298 (7th Cir.1987); *United States v. Shively*, 715 F.2d 260, 267 (7th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984). The "general rule is that persons jointly indicted should be tried together, especially in conspiracy cases." *United States v. Madison*, 689 F.2d 1300, 1305 (7th Cir.1982), *cert. denied*, 459 U.S. 1117, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983). The defendant bears an "extremely difficult burden of showing on appeal that the lower court's action was an abuse of discretion." *United States v. Hedman*, 630 F.2d 1184, 1200 (7th Cir.1980); *United States v. Kendall*, 665 F.2d 126, 137 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). A defendant can prevail on a motion to sever only if he demonstrates that a "fair trial cannot be had without severance, not merely that a separate trial offers a better chance for acquittal." *Kendall*, 665 F.2d at 137. The defendant "must also show that the joint trial resulted in actual prejudice." *United States v. Garver*, 809 F.2d 1291, 1298 (7th Cir.1987) (quoting *United States v. Dounias*, 777 F.2d 346 (7th Cir.1985)).

▮ Delgado has failed to meet this heavy burden. He claims that actual prejudice resulted from the joint trial because of the disparity in the evidence adduced against him and his co-defendants because his participation in the conspiracy was very slight. That evidence adduced against co-conspirators might have been greater than that adduced against the defendant does not of itself constitute grounds for severance. *Garner*, 809 F.2d at 1298; *United States v. Hendrix*, 752 F.2d 1226, 1232 (7th Cir.1985); *United States v. Hedman*, 630 F.2d 1184, 1200 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); *United States v. Grabiec*, 563 F.2d 313, 319 (7th Cir.1977). Furthermore, there was no "disparity" in the evidence, since the bulk of the evidence was properly admitted against Delgado as a charged member of the conspiracy. In a separate trial, Delgado would have been prosecuted for conspiracy and much of the same evidence would have been admitted against

him. The district court's decision not to grant severance was thus in accord with the policy of judicial economy which "favors [the] joint trial of defendants where largely the same evidence would be admitted in separate trials of each defendant." *Dounias*, 777 F.2d at 350 (quoting *Hattaway*, 740 F.2d at 1424).

An examination of the record reveals that Delgado mischaracterizes the evidence when he claims that he was "minimally involved" in the conspiracy. Delgado was the central figure in the arms deal in Dallas. He travelled from Chicago to Dallas to meet with Rubrecht in order to procure weapons for the escape plan and the subsequent "armed struggle." He met with Rubrecht and discussed in detail the weapons that he and his co-conspirators sought to purchase. Rubrecht gave him a new telephone number to call to arrange for the sale of the C–4 explosives and soon thereafter a call was placed to that number and a meeting was set up to consummate the arms deal. All of this was in furtherance of the conspiracy. Without Delgado's participation, the conspirators would not have been able to obtain the C–4 explosives, which Willmott and Marks took with them to California. Delgado's involvement, while limited in duration, was hardly minimal.

The absence of actual prejudice towards Delgado from the joint trial is further evidenced by the district court's instruction to the jury that:

Although the defendants are being tried jointly, you must give separate consideration to each defendant. In doing so you must analyze what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his or her case decided as the evidence and the law is applicable to him or her.

The district court was aware of the potential for prejudice inherently involved in the joint trial of co-conspirators and instructed the jurors to ward against such prejudice. The jury is presumed to have followed that

clear instruction. *Evans v. Young*, 854 F.2d 1081, 1084 (7th Cir.1988).

In summary, there was sufficient evidence to support the jury's verdict against Delgado and the jury was properly instructed on how to evaluate the evidence. Delgado played a critical role in the weapons and escape conspiracy. Accordingly, we find that Delgado has failed to demonstrate "actual prejudice," and the district court did not abuse its discretion in refusing to grant Delgado's repeated motions for severance.

## VIII. Sababu's Entrapment Claim

■ At the time of trial, it was the law of this circuit that a defendant could not deny any element of the charged offense and still raise an entrapment defense. Sababu asserts that, because of this rule, he was barred from raising an entrapment defense at trial. After trial, however, the Supreme Court ruled that a defendant can deny an element of the crime and still raise an entrapment defense. *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). Sababu argues that, in light of the Supreme Court's ruling, his conviction should be overturned and remanded for a new trial because there was sufficient evidence to warrant an entrapment instruction.[9]

■ A valid entrapment defense is comprised of two elements: government inducement of a crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct. *Mathews*, 108 S.Ct. at 886; *United States v. Marren et al.*, 890 F.2d at 929 (7th Cir.1989). In *Mathews*, the Supreme Court held that even if a defendant denies an element of a crime, he is entitled to an entrapment instruction "whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Mathews*, 108 S.Ct. at 886. Sababu does not claim that he was prevented from offering evidence of en-

trapment at trial but instead argues that there was sufficient evidence adduced at trial to support such an instruction. We disagree.

■ Sababu has failed to make even a colorable showing that there was evidence warranting an entrapment instruction. The record is wholly devoid of evidence of his lack of predisposition to commit the crime or that he was induced by the government. Sababu argues in his brief that "many of the facts supporting the defense were brought out at trial." Unfortunately, he does not direct us to those facts, and we were unable to find them on our own. Indeed, what the evidence does show is that Sababu was one of the initial members of the conspiracy and that he was integrally involved in the plans to procure weapons and violently escape from prison long before Lebosky or Cobb became government informants. As such, he clearly was predisposed to join the conspiracy and was in no way induced by the government into doing so. Sababu's claim is without merit as he has failed to meet his burden of producing sufficient evidence of both the government's inducement and his own lack of predisposition. *See United States v. Hawkins*, 823 F.2d 1020, 1024 (7th Cir.1987). Accordingly, we deny his claim.

## IX. Garcia's Additional Claims

■ Garcia claims that her sixth amendment rights were infringed by the presence in the jury room of a document which had not been admitted into evidence. She also argues that the district judge erred in refusing to conduct a *voir dire* of the jury concerning the effect of the transcript on jury deliberations. We reject both of her contentions.

The document in question, government exhibit Tr–6D, was a transcript of a telephone conversation between Garcia and Lo-

---

**9.** Although *Mathews* was decided after the defendants were convicted, its rule is applicable here in view of the Supreme Court's holding in *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987), that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for past cases in which the new rule constitutes a 'clear break' with the past."

pez that had been excluded by the district court who found the taped conversation to be largely inaudible. The fifteen-page transcript covered seven minutes of this conversation, which occurred on March 24, 1985, while Lopez was incarcerated at Leavenworth and Garcia was at her home. After the close of arguments at trial, each juror was provided with four volumes of government exhibits. The district court admonished both the prosecution and the defense to closely examine the exhibit binders before they were sent to the jury room. Nevertheless, during the second day of the jury's deliberations, a juror sent a note to the judge questioning whether the transcript, which was in one juror's exhibit binders, was properly in evidence. The court immediately ordered that all government exhibit binders be removed from the jury room and be rechecked for the presence of inadmissible evidence.

The trial judge met with the two parties and instructed them to draft a curative jury instruction. The judge ultimately instructed the jury that "Tr–6D is not in evidence. The transcript of a purported conversation of March 24, 1985, was sent to you in error and is being withdrawn from the book in which it was placed. You must disregard this transcript entirely and continue your deliberations." Defense counsel, unsatisfied with the curative instruction, demanded that a mistrial be declared or that the district court conduct a *voir dire* of the jury to probe the effect of the transcript on their deliberations. The prosecution objected, noting that conducting a *voir dire* might give undue significance to the transcript. The court refused to question the jury, finding that the transcript did not carry the significance that the defendants suggested and that their claims of prejudice were exaggerated. He also stated that he was barred from questioning the jury by Fed.R.Evid. 606(b).[10]

A criminal defendant in our system has "a right to be tried on the basis of the evidence admitted at his trial, and this right may be violated if the jury gets access to extra-record evidence ... even if the access is not the result of any prosecutorial misconduct." *United States v. Bruscino*, 687 F.2d 938, 940 (7th Cir.1982), *cert. denied*, 459 U.S. 1228, 103 S.Ct. 1235, 75 L.Ed.2d 468 (1983) (en banc). Nevertheless, a new trial is not automatically required whenever a jury is exposed to material not properly in evidence. Rather, a new trial is required only when there is a "reasonable possibility" that the documents affected the jury verdict. *Id.* Each case must "turn on its special facts," *Marshall v. United States*, 360 U.S. 310 (1959), and in each case the crucial factor is "the degree and pervasiveness of the prejudicial influence possibly resulting" from the jury's exposure to the extraneous material. *United States v. Solomon*, 422 F.2d 1110 (7th Cir.1970). The district court has the primary responsibility for making this determination of prejudice, and an appellate court must review the district court's determination under an "abuse of discretion" standard. *Bruscino*, 687 F.2d at 940; *United States v. Key*, 859 F.2d 1257, 1264 (7th Cir.1988). "The inquiry into prejudice becomes a matter of addressing the probabilities that a particular jury was prejudiced by particular documents. The district court will always be in a better position than the appellate judges to assess the probable reactions of jurors in a case over which he has presided." *Bruscino*, 687 F.2d at 941. "As we cannot put ourselves in the district judge's shoes in these matters we ought to accept his judgment unless we have a very strong conviction of error." *Id.*

We believe that the district court was correct in its determination that there was

---

10. Rule 606(b) states:
 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indict-

 ment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

no "reasonable possibility" that the transcript affected the verdict. *Bruscino*, 687 F.2d at 940. As the court noted in its post-trial opinion, the transcript had no impact on the verdict since Garcia was acquitted on the two Travel Act counts that relate to the transcript. Apparently, the jury was not persuaded that she travelled to or from Leavenworth in March of 1985 with the intent to promote arson. Nor was the jury persuaded that during the visit she spoke in code about Delgado's trip to Dallas to buy weapons and explosives. We also accept the district court's judgment that there was not a "reasonable possibility" that the transcript affected the jury's conviction on the conspiracy charge because there was other ample evidence of Garcia's involvement in the conspiracy. Any impact that the transcript might have had was limited because the import of the transcript is not apparent on its face. The court made a specific finding to that effect, noting that defendant's claim of prejudice was greatly exaggerated as the transcript contained 15 pages of seemingly innocent and rambling discussion. Only through detailed analysis and argument could the government have established that the defendants spoke in code about the negotiations for weapons and explosives. Even the defendant has characterized the transcript as "virtually incomprehensible." *See United States v. Solomon*, 422 F.2d 1110 (7th Cir.1970). Therefore, we affirm the district court's determination that "in this case, it is clear that the transcript had *no* impact on the verdict.... Thus it was manifest that in this case there was no 'reasonable possibility' that the transcript affected the verdict and the verdict must be sustained."

▮ We also believe that the district court did not abuse its discretion in refusing to conduct a *voir dire* of the jury as to the effect of the transcript on the jury's deliberations. A district court "has broad discretion to remedy prejudicial influences." *United States v. Williams*, 737 F.2d 594 at 613 (7th Cir.1984) (quoting *United States v. Verkuilen*, 690 F.2d 648, 658 (7th Cir.1982)). In the instant case, the district court believed that a curative in-

struction was the proper remedy. The jury is presumed to have followed that clear instruction. *Evans v. Young*, 854 F.2d 1081, 1084 (7th Cir.1988) (citing *Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985)). The district court properly found that questioning the jury in such a situation "might jeopardize an accused's rights, in some instances, by causing the jurors polled to attach undue significance to the incident." *United States v. Williams*, 822 F.2d 1174 at 1189–90 (D.C.Cir.1987). The district court believed that the defendants' claims of prejudice were exaggerated and that the presence of the transcript was not prejudicial since, as the defendants themselves admit, the conversation was "virtually incomprehensible." In such a situation, it was reasonable for the district court to conclude that *voir dire* was unnecessary and inappropriate. Accordingly, we find that the court did not abuse its discretion in refusing the defendant's request that he question the jury.

▮ The district court also based its refusal to question the jury on the grounds that he was barred from doing so under Fed.R.Evid. 606(b). Rule 606(b) is a proscription against *post*-verdict questioning jurors directly about the effect of outside contact on their deliberations. *Owen v. Duckworth*, 727 F.2d 643, 646 (7th Cir. 1984). As we have noted

> [s]o far as the testimony of trial jurors is concerned, the district court's inquiry into the validity of a verdict is governed by Fed.R.Evid. 606(b). The Rule was designed to protect the entirety of the jury's deliberative process, including arguments, statements, discussions, mental and emotional reactions, and votes. Fed. R.Evid. 606 Advisory Committee Note. The Rule does allow jurors to testify as to whether extraneous information or an outside influence reached them. However, it prohibits jurors from giving *post-verdict* testimony as to whether their deliberations, in fact, were prejudiced by the extraneous information or outside influence.

*United States ex rel. Buckhana v. Lane*, 787 F.2d 230, 238 (7th Cir.1986) (quoting *Wiedemann v. Galiano*, 722 F.2d 335, 337

(7th Cir.1983)) (emphasis supplied). The Rule, by its own terms, limits inquiries into "the validity of the verdict or indictment." In the instant case, the judge was requested to question the jurors *during* their deliberations and *before* they had reached a verdict. In such a situation, the Rule is inoperative and the trial judge was not restricted by it from conducting a *voir dire* of the jury as to the effect of the transcript on the deliberations. The cases cited by the trial court and the government asserting that the Rule limits the trial court's inquiry into the affect of extraneous matters involve *post*-verdict situations. Apparently, the trial court wrongly relied on Rule 606(b) in declining to question the jury. We believe, however, that such error was harmless. The court had other valid reasons for refusing to question the jury.

Garcia also argues that under the Supreme Court's decision in *Remmer v. United States*, 347 U.S. 227, 229–30, 74 S.Ct. 450, 451–52, 98 L.Ed. 654 (1954), the presence of the transcript in the jury room was to be deemed "presumptively prejudicial" and that a hearing was necessary to enable the government to properly meet its "heavy burden" of proving the harmlessness of the transcript. In *Remmer*, the Court stated that the trial court "should determine the circumstances [surrounding the improper contact] and the impact thereof on the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer*, 347 U.S. at 229–30, 74 S.Ct. at 451. We have interpreted this hearing requirement as not "requiring, especially in the context of an ongoing trial, a certain quantum of proof to overcome the presumption of prejudice, or as mandating a particular procedure for conducting a hearing." *Evans v. Young*, 854 F.2d 1081, 1083 (7th Cir.1988). In the instant case, through his discussions with counsel and his subsequent instruction to the jury, the trial court "was able to fully investigate and dispel any prejudice arising from the contact before the jury reached its verdict." *Evans*, 854 F.2d at 1084 n. 1. The trial courts retain wide latitude over how to conduct such hearings and substantial discretion over the determination of whether the prejudice arising from the unauthorized contact is rebutted or harmless. *Evans*, 854 F.2d at 1084; *United States v. Thibodeaux*, 758 F.2d 199, 202 (7th Cir.1985). Accordingly, we believe that the district court's actions in the instant case satisfy *Evans* and *Remmer*.

## X.

The judgment of the district court is AFFIRMED.